MAYER BROWN LLP
TIMOTHY S. BISHOP (IL 6198062)
(*pro hac vice application forthcoming*)
 tbishop@mayerbrown.com
71 S. Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 782-0600
Facsimile:  (312) 701-7711

MAYER BROWN LLP
C. MITCHELL HENDY (SBN 282036)
 mhendy@mayerbrown.com
350 South Grand Avenue
25th Floor
Los Angeles, California  90071-1503
Telephone:  (213) 229-9500
Facsimile:  (213) 625-0248

Attorneys for Plaintiffs National Pork Producers
Council & American Farm Bureau Federation

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL PORK PRODUCERS COUNCIL & AMERICAN FARM BUREAU FEDERATION,<br><br>Plaintiffs,<br><br>v.<br><br>KAREN ROSS, in her official capacity as Secretary of the California Department of Food & Agriculture, & SONIA ANGELL, in her official capacity as Director of the California Department of Public Health, and XAVIER BECERRA, in his official capacity as Attorney General of California,<br><br>Defendants. | CASE NO. **'19 CV 2324 W    AHG**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs the National Pork Producers Council and the American Farm Bureau Federation allege upon information and belief as follows:

**INTRODUCTION AND NATURE OF CLAIMS**

1. The market for pork produced in the United States ("U.S.") is enormous and national and international in scope.

2. It meets a demand for high-quality, affordable protein.

3. According to the U.S. Department of Agriculture's Census of Agriculture for 2017, nearly 65,000 farms nationwide sold hogs that year with a market value of more than $26 billion.

4. During the first nine months of 2019, some 94 million hogs were slaughtered at federally inspected facilities, for a rate of about 125 million hogs slaughtered per year.

5. Pigs are raised throughout the country, but production is concentrated in the Midwest and North Carolina. The latest Agriculture Census reported that 22.7 million pigs were sold by Iowa farms in 2017, 8 to 9 million each by North Carolina, Oklahoma, and Minnesota farms, 5.25 million by Illinois farms, and 4.5 million by South Dakota farms.

6. The U.S. is one of the world's top five pork exporters. It has exported over 5 billion pounds of fresh and frozen pork cuts annually to foreign markets, on average, since 2010, principally to Mexico, China, Japan, and Canada.

7. The U.S. commercial production chain for pork is complex and varied, using principally a segmented production model driven by herd health considerations and to achieve economies of scale.

8. Sows are female pigs held for breeding that give birth to the piglets that ultimately become hogs sent to market. For disease prevention and efficiency, sows are usually maintained on sow-specific farms that are commonly separated from other hog facilities. On those sow farms, the sows are generally artificially inseminated, litters of piglets are born ("farrowed"), and the piglets are then raised

1

for about three weeks before they are weaned at the weight of approximately 10 pounds.

9.     The overwhelmingly vast majority of sow farms use some type of indoor confinement for these processes.  Indoor housing allows year-round production by protecting sows from seasonal weather changes, disease exposure, and predators, while facilitating the management of each sow's health, conditioning, feeding, and reproduction.

10.     Only a small portion of the pigs that are slaughtered for meat are sows that have been kept to reproduce—only 2.2 million in the first nine months of 2019, compared to 91.8 million of their male ("barrows") and female offspring, which are raised as feeder or market hogs.  And almost none of the meat from those sows is sold as whole pork cuts; it is instead used in prepared or cooked products and sausages.

11.     The offspring of sows ("market hogs") are raised to market weight in separate, specialized production facilities: (1) feeder pig producers, or nurseries, which raise pigs from weaning to about 40-60 pounds, then sell them for finishing; (2) feeder pig finishers, which buy feeder pigs and grow them to their slaughter weight of about 240-280 pounds; and (3) farrow-to-finish operations, a small percentage of farms that raise hogs from weaning to their slaughter weight. Farrow to finish takes 24-26 weeks.

12.     Once they reach slaughter weight, hogs are sent to packing facilities, which may be local or in other states.  Packer facilities receive hogs from multiple farms, operated by multiple producers.  These farms may be owned by affiliates of the packer, by producers who have contracts to deliver hogs to the packer, or by independent producers.

13.     A packing facility typically slaughters thousands, or even tens of thousands, of hogs daily.  Packers process the slaughtered hogs into whole pork cuts (or send them to separate processing facilities for this and later steps), pack the

2

meat, and deliver it to wholesale or large retail customers throughout the country and abroad.

14.     California's Proposition 12, challenged here, is a ballot initiative that was passed in November 2018 and that amended the California Health and Safety Code.

15.     Proposition 12 has thrown a giant wrench into the workings of the interstate market in pork.

16.     In California itself, there are estimated to be only some 8,000 breeding sows, most of which are in family-focused "4-H" and other county fair and similar show-pig programs.

17.     It is believed that only about 1,500 out of California's 8,000 sows are used in commercial breeding in the state, housed in a handful of very small farms.

18.     Commercial sows typically produce two litters a year of about 10 piglets, so those 1,500 sows may produce around 30,000 offspring a year.  Those sows are therefore insufficient even to supply the current in-state farms' annual capacity of approximately 65,000 commercial hog finishing spaces that exist in California, which must therefore be filled from out-of-state sows.

19.     By contrast to the tens of millions of hogs sold by farms in many other states, the Agriculture Census reports that only 208,000 hogs were sold by all farms in California in 2017, including those born (farrowed) outside California.

20.     California's pork consumption makes up about 13 percent of the national market.  Accordingly, California's in-state sow breeding scarcely puts a dent in the demand for pork consumed in the state.  The offspring of about 673,000 sows is required to satisfy California consumers' demand for pork meat annually, compared to the 1,500 sows that are commercially bred in-state.

21.     Proposition 12 forbids the sale in California of whole pork meat from hogs born of sows that were not housed in conformity with the law's requirements.

22.     A violation of Proposition 12 is a criminal offense punishable by fines and imprisonment, and also the basis for civil liability under California's unfair competition statute.

23.     Proposition 12 requires that a sow cannot be confined in such a way that it cannot lie down, stand up, fully extend its limbs, or turn around without touching the sides of its stall or another animal.  This requirement is often referred to as "stand up-turn around."

24.     Stand-up turn-around effectively requires that producers house their sows together in a group, referred to as "group housing."  This housing structure may also be referred to as a "pen."  In contrast, individual stalls each hold one sow apiece and do not allow sows to turn around.

25.     Proposition 12 bans the use of individual stalls that do not meet stand-up turn-around requirements, except during the five-day period prior to farrowing and during weaning.  It accordingly bars the use of individual stalls during breeding and most of the gestation period.

26.     After December 31, 2021—but with immediate impact now on what producers must do given the lead time needed for building and production changes—each sow must be allotted at least 24 square feet of space in the group pen, subject to the same limited exception for the five-day period prior to farrowing and during weaning.

27.     Only a miniscule portion of sows in the U.S. are housed in compliance with all of Proposition 12's requirements.

28.     Proposition 12 institutes a wholesale change in how pork is raised and marketed in this country.  Its requirements are inconsistent with industry practices and standards, generations of producer experience, scientific research, and the standards set by other states.  They impose on producers costly mandates that substantially interfere with commerce among the states in hogs and whole pork meat.  And they impose these enormous costs on pork producers, which will

4

ultimately increase costs for American consumers, making it more difficult for families on a budget to afford this important source of protein.  And they do all this for reasons that are both fallacious and vastly outweighed by the economic and social burdens the law imposes on out-of-state producers and consumers and on the authority of other states over their domestic producers.

29.    Proposition 12 imposes these severe requirements as the result of a ballot initiative drafted by the Humane Society of the United States ("HSUS").

30.    Because Proposition 12 was a ballot initiative, it was passed without any semblance of meaningful legislative deliberation, let alone inclusive input and inquiry into the impacts of its requirements on national commerce in pork, on the pork production industry, or even the welfare of sows.

31.    Because it reaches extraterritorially to impose California's idiosyncratic and unjustified sow housing requirements on other states and their producers, because it Balkanizes hog production in ways inconsistent with our Federalist system, and because it imposes burdens on interstate commerce that far outweigh any of its benefits, Proposition 12 violates the dormant Commerce Clause and is unconstitutional.

32.    Plaintiffs seek a declaration that Proposition 12's requirements with regard to breeding pigs violate the Commerce Clause and principles of interstate federalism embodied in the U.S. Constitution, and an injunction against the enforcement of Proposition 12's requirements concerning pork.

33.    While Proposition 12 regulates the production of veal, pork, and eggs, the basis of Plaintiffs' challenge here is Proposition 12's extraterritorial reach and market disruption regarding pork production.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**JURISDICTION**

34.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 because this case presents a federal question arising under the Commerce Clause of the U.S. Constitution and under 42 U.S.C. § 1983.

35.     This Court has authority to enjoin enforcement of Proposition 12 under 42 U.S.C. § 1983 and to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

**VENUE**

36.     Venue is proper in this district under 28 U.S.C. § 1391(b) because all Defendants maintain an office and conduct their official duties within this judicial district.

37.     Additionally, substantial events giving rise to this lawsuit occurred and will continue to occur within this judicial district.  Plaintiffs' members produce and sell pork that is or may be sold in California (including within this judicial division).  Pork produced by Plaintiffs' members inevitably is imported into and consumed within this district, because the roughly 9% of California's population located within this district consumes more pork than can be produced by the approximately 8,000 sows located within California.

**THE PARTIES**

38.     Plaintiff National Pork Producers Council ("NPPC") is a federation of 42 affiliated state associations and other regional and area organizations.  NPPC's members include U.S. pork producers along with other industry stakeholders such as packers, processors, companies that serve the pork industry, and veterinarians.  NPPC is the global voice of the U.S. pork industry.  Its mission is to advocate on behalf of its members to establish reasonable federal legislation and regulations, develop revenue and export-market opportunities, and serve the interests of pork producers and other industry stakeholders.  This includes advocating for free

market access for pork producers and opposing measures that restrict producers' market opportunities.

39.     Plaintiff American Farm Bureau Federation ("AFBF") is a voluntary membership organization formed by farm and ranch families in 1919.  Today, AFBF represents just under 6 million member families through Farm Bureau organizations in all 50 States plus Puerto Rico.  America's largest general farm organization, AFBF represents the people who grow and raise virtually every agricultural product in the United States.  AFBF seeks to promote the development of reasonable and lawful public policy for the benefit of farmers and consumers.  According to AFBF's mission statement: "We are farm and ranch families working together to build a sustainable future of safe and abundant food, fiber, and renewable fuel for our nation and the world."

40.     Defendant Karen Ross is sued in her official capacity as the Secretary of the California Department of Food and Agriculture ("CDFA"), which is a State of California regulatory entity responsible for jointly issuing regulations to implement Proposition 12.

41.     Defendant Sonia Angell is sued in her official capacity as the Director of the California Department of Public Health ("CDPH"), which is a State of California regulatory entity responsible for jointly issuing regulations to implement Proposition 12.

42.     Xavier Becerra is sued in his official capacity as the Attorney General of California.  The Attorney General's office is responsible for enforcing the provisions of Proposition 12 that make its violation a criminal offense.

## **STANDING**

43.     AFBF and NPPC bring this suit on behalf of themselves and their members.  They have each suffered and continue to suffer concrete and particularized injuries that are fairly traceable to Proposition 12.  Their injuries will

be redressed by a favorable decision. *See Organic Consumers Assoc. v. Sanderson Farms, Inc.*, 284 F. Supp. 3d 1005 (N.D. Cal. 2018).

44.     As a result of Proposition 12, AFBF and NPPC have expended substantial resources to understand the obligations, requirements and impacts of Proposition 12, and then to explain to pork producer members the meaning and requirements of Proposition 12 and changes to farming practices that would be necessary to comply with Proposition 12.

45.     On NPPC's part, these efforts have entailed fielding inquiries from members regarding Proposition 12 and its expected impact on pork production and the supply chain, developing data sheets that summarize Proposition 12 into audience-friendly information, and holding and participating in meetings and teleconferences with members and industry-stakeholders. *See* Exh. A, Decl. D. Hockman, ¶¶ 21-24.

46.     NPPC personnel additionally fielded numerous questions from suppliers, packers, distributors, retailers, and food-service companies regarding the impact that Proposition 12 will have on the supply of pork product. *Id.*

47.     AFBF personnel have also hosted and participated in presentations, teleconferences, and other events for purposes of informing members and state Farm Bureau staff about what coming into compliance with Proposition 12 will require. *See* Exh. B, Decl. S. Bennett, ¶¶ 9-11.

48.     Both AFBF and NPPC submitted detailed comments to the CDFA on June 3, 2019, explaining how Proposition 12 will negatively impact the pork production industry and is unconstitutional. *See* Exh. A, Decl. D. Hockman, ¶ 22; Exh. B, Decl. S. Bennett, ¶ 11.

49.     Because of resources they have expended addressing Proposition 12, both AFBF and NPPC have diverted resources from pursuing other matters central to the organizations' missions. *See* Exh. A, Decl. D. Hockman, ¶ 30; Exh. B, Decl. S. Bennett, ¶ 12.

1    50.    On AFBF's part, this includes time and money that could have been

2    spent advancing other issues critical to AFBF's mission to advance reasonable

3    farm policy.  Exh. B, Decl. S. Bennett, ¶ 4.

4    51.    On NPPC's part, these diverted costs include time and resources that

5    could have been spent pursuing NPPC's core mission of establishing reasonable

6    industry regulation on a nationwide level.  Exh. A, Decl. D. Hockman, ¶ 20.

7    52.    Resources have also been diverted from NPPC's efforts on behalf of

8    its members to address other important issues, including international trade and

9    free access to markets.  *Id.* ¶ 30; Exh. C, Decl. H. Roth, ¶¶ 9-12.

10    53.    Both NPPC and AFBF anticipate that, as California implements

11    Proposition 12, they will need to divert more resources and time from other core

12    organizational priorities to assist members with understanding what is involved in

13    coming into compliance (or not coming into compliance) with Proposition 12.  *See*

14    Exh. A, Decl. D. Hockman, ¶ 28; Exh. B., Decl. S. Bennett, ¶ 13.

15    54.    These organizational injuries would be remedied by the relief sought

16    in this action.

17    55.    In addition, both AFBF and NPPC have associational standing to

18    challenge Proposition 12 on behalf of their members.

19    56.    One or more members of AFBF and NPPC have standing to bring this

20    action in their own right.  Plaintiffs are submitting declarations from some of these

21    members as exhibits, attached to this Complaint and incorporated herein by

22    reference.  *See* Exh. D, Decl. G. Boerboom; Exh. E, Decl. P. Borgic; Exh. F, Decl.

23    N. Deppe; Exh. G, Decl. M. Falslev; Exh. H, Decl. T. Floy; Exh. I, Decl. T. Hays;

24    Exh. J, Decl. P. Jordan; Exh. K, Decl. C. Leman; Exh. L, Decl. G. Maher; Exh. C,

25    Decl. H. Roth; Exh. M, Decl. R. Spronk; Exh. N, Decl. J. Hofer.

26    57.    Thousands of AFBF and NPPC pork producer members are directly

27    subject to Proposition 12 because they breed or raise pigs that are or may be sold

28    into California.  Almost all of these members are currently raising pigs that do not

9

meet Proposition 12's requirements and are suffering and will suffer imminent, concrete and particularized injuries as a result of Proposition 12—either substantial compliance costs or loss of a major market for their products.

58.     While all manner of hog farms across the country are harmed by Proposition 12, from large-scale to small, independent farms, a sampling of affected NPPC and AFBF pork producer members who have submitted declarations in support of the Complaint includes the following:

   a.  Mr. Greg Boerboom is a hog producer on his third-generation farm in Southwest Minnesota.  He has lived on that farm since he was born. Mr. Boerboom now owns a total of 10,000 sows, from which he produces around 320,000 market hogs annually.  Some of his sows are housed in group pens, and others in individual stalls.  But, as a consistent practice since 1988, Mr. Boerboom has always housed his sows in individual stalls for at least seven days between weaning and breeding.  He noticed when he held his sows in group pens for these seven days after weaning that they would fight and bite at each other, resulting in rips and permanent damage to the sows' udders.  Since keeping sows in breeding stalls during this time, the productivity rate on his farm has increased, and incidences of sow injuries have decreased.  Mr. Boerboom is one of the most successful hog producers in the U.S. to operate under a group housing system, which he manages through an incredible amount of hard work and an expensive electronic feeding system developed by a Dutch company, Nedap, that requires skilled labor and training to operate.  Despite Mr. Boerboom's great success in managing sows, his farming practices do not comply with Proposition 12, because he does not provide each sow 24 square feet, and he cannot not imagine moving his sows back into a group pen directly after weaning, as Proposition 12 requires.

10

1   Nor does Mr. Boerboom comply with Proposition 12's requirements

2   as to gilts (young, unbred sows), because he follows the standard

3   industry practice of keeping gilts in individual stalls until they are first

4   bred at about seven months of age, which is past the six months

5   during which Proposition 12 allows use of stalls.  Because Mr.

6   Boerboom will not comply with Proposition 12, his product will be

7   barred from the California market.  *See* Exh. D, Decl. G. Boerboom.

8   b.  Mr. Phil Borgic is the owner of a family farm located in Nokomis,

9   Illinois. Mr. Borgic produces around 225,000 hogs annually and sells

10   his product under market contracts with Smithfield Foods

11   ("Smithfield") and JBS USA ("JBS").  Mr. Borgic houses his sows in

12   individual stalls throughout gestation because, based on his lifetime of

13   experience raising sows, he determined that individual stalls are best

14   for the welfare of his sows and the productivity of his farm.  Mr.

15   Borgic's housing of gilts also does not comply with Proposition 12.

16   Compliance with Proposition 12 would be cost-prohibitive for Mr.

17   Borgic.  It would require him either to spend around three million

18   dollars on construction costs expanding his facilities or to reduce his

19   sow herd by one-third, destroying his farm's productivity and

20   rendering him unable to meet delivery performance requirements in

21   his contracts with JBS and Smithfield.  It would also result in worse

22   welfare outcomes for his sows, significantly lower sow productivity,

23   and increased labor costs.  If Proposition 12 remains in place, Mr.

24   Borgic is concerned that the price he receives for his product will drop

25   because whole meat from his market hogs could not be sold into

26   California.  Mr. Borgic also stands to lose his longstanding business

27   relationships with JBS and Smithfield, both of which sell into

28   California.  *See* Exh. E, Decl. P. Borgic.

11

c. Mr. Nathan Deppe operates a farrow-to-finish hog farm in Washington, Missouri, that has been in his family for generations. He produces around 30,000 market hogs annually, which he then sells to JBS under a marketing contract. Mr. Deppe houses his sows in group pens that provide about 15 square feet per sow for most of gestation. Nevertheless, he also uses individual breeding stalls to help sows regain weight post weaning, to accomplish artificial insemination, and then to house the sows for an additional 28 days until he can confirm that his sows are pregnant before moving them back into the group pens. The changes required to comply with Proposition 12 are too costly for Mr. Deppe's business to survive. Mr. Deppe anticipates Proposition 12's restrictions would significantly damage productivity on his farm and negatively impact the welfare of his animals. Productivity losses, along with construction costs to convert his housing to provide 60% more space per sow to comply with Proposition 12, would be too high for him to bear. Because of Proposition 12, Mr. Deppe has lost the opportunity to sell his whole pork product into supply chains bound for the large California market. *See* Exh. F, Decl. N. Deppe.

d. Mr. Mike Falslev is an independent hog producer on his farm near Logan, Utah. Mr. Falslev's farm specializes in serving the predominantly Asian-American market for suckling pigs. To satisfy the demand primarily from Asian-American consumers in California, he sells about 600 pigs per week under a five-year contract to a packing plant located in California. Thus, essentially all of his product is bound for California. Currently, Mr. Falslev houses all of his sows in individual stalls until he confirms that they are pregnant. He keeps some of the sows in individual stalls throughout gestation,

12

but, after confirming that these sows are pregnant, moves others into a hoop barn where they are housed in a group.  Changing these practices to comply with Proposition 12's housing requirements would lower productivity on Mr. Falslev's farm by requiring him to move his sows into the hoop barn directly after weaning.  He would lose the ability to provide a peaceful environment for the sows to recover and regain weight from their previous litter, and instead be required to subject them to stress and fighting with other animals during the vulnerable time between insemination and before the embryo attaches to the uterine wall.  This would seriously damage productivity and conception rates, because his pigs fight for feed and territory when moved into the group pen.  It would also make Mr. Falslev's process for artificially inseminating sows much more difficult and increase his labor costs, because it is more difficult for him to care for the sows in the hoop barn.  Compliance would also require Mr. Falslev to expend significant construction costs to construct a new barn with open space.  Alternatively, constructing enough hoop barns to replace his lost production would cost Mr. Falslev almost as much, and would take up an enormous amount of land.  Operating solely out of hoop barns rather than using individual breeding stalls would also significantly increase Mr. Falslev's operating costs.  For example, the colder hoop barn requires straw bedding to provide warmth, and the straw bedding triples the amount of waste and manure that needs to be disposed of, requiring a great deal of additional labor.  It also makes it much more difficult to maintain comfortable temperatures for his sows during the cold of winter and the heat of summer.  If Mr. Falslev does not bear these significant costs, Proposition 12 will block Mr. Falslev's product from

13

1  the lucrative suckling pig market in California.  Proposition 12 leaves
2  Mr. Falslev with no good alternatives.  *See* Exh. G, Decl. M. Falslev.
3  e. Mr. Tom Floy has been an Iowa hog producer for the past 45 years.
4  Mr. Floy produces 1,500 to 2,000 market hogs annually.  He sells his
5  hogs exclusively to Tyson Foods ("Tyson"), which in turn sells the
6  resulting product all over the country and the world.  Mr. Floy houses
7  his sows in individual stalls that do not allow them to turn around.
8  Compliance with Proposition 12 would require Mr. Floy to bear
9  significant construction costs to provide his sows with around 40%
10  more space.  Mr. Floy would need to expend significant time to select
11  appropriate equipment and design and educate himself on how to
12  manage the new sow housing system.  Mr. Floy also expects that
13  compliance would significantly lower productivity on his farm and
14  reduce the welfare of his sows.  After moving from open lots to
15  individual stalls in 1994, Mr. Floy noticed that his sows experience
16  fewer injuries and produce a greater number of parities (farrowings).
17  Because of Proposition 12, Mr. Floy's product will be barred from the
18  California market.  He is concerned that loss of access to the market
19  harms the value of his product and will decrease its price.  *See* Exh. H,
20  Decl. T. Floy.
21  f. Mr. Todd Hays is a fifth-generation hog producer on a farrow-to-
22  finish farm located in Monroe City, Missouri, who raises and finishes
23  approximately 13,500 market hogs per year.  Pursuant to a two-year
24  contract, Mr. Hays sells ninety percent of these hogs to Smithfield,
25  which he has been in business with for the past ten years.  Mr. Hays
26  houses his sows in individual stalls.  Mr. Hays anticipates that
27  changing his sow housing practices to comply with Proposition 12
28  would increase sow mortality and lameness rates on his farm,

14

dramatically reduce his productivity rates, and require more labor and personnel to operate his farm.  These productivity losses and the costs of either constructing new Proposition 12-compliant facilities or reducing his current sow population to provide the needed space per sow are likely greater than his business could bear, because Mr. Hays would not receive enough return to cover these large costs.  Because of Proposition 12, Mr. Hays will lose the opportunity to sell his whole pork product into supply chains bound for the large California market and his business will become less attractive to suppliers who choose to comply with Proposition 12.  *See* Exh. I, Decl. T. Hays.

g. Mr. Phil Jordan is a hog producer on his family-owned farm in Ohio, where he produces approximately 35,000 market hogs annually and is looking to expand his operations.  Mr. Jordan sells his market hogs primarily to JBS under a marketing agreement.  He holds the majority of his sows in individual stalls, but is currently in the process of converting his sow housing to a group pen system as required under Ohio regulations by December 2025; however, those group pens will not provide 24 square feet per sow.  In addition, as permitted by Ohio's regulations, Mr. Jordan will continue to place all of his sows in individual breeding stalls for the first thirty-five to forty days after weaning until they are confirmed pregnant in order to maximize embryonic welfare.  Mr. Jordan does not plan to comply with Proposition 12, because he cannot imagine moving a sow directly after weaning into a group pen in her weakened state rather than protecting the sow in an individual stall and providing her with enough feed to recover from weaning.  Further, coming into compliance with Proposition 12 would require Mr. Jordan to significantly downsize his herd or incur steep construction costs to

15

1       expand his sow housing.  It would be very difficult for Mr. Jordan to

2       change his plans to come into compliance with Ohio's regulations by

3       December 2025 to also come into compliance with California's more

4       restrictive regulations at the earlier date of December 31, 2021.

5       Because of Proposition 12, Mr. Jordan will lose the opportunity to sell

6       his whole pork product into supply chains bound for the California

7       market.  *See* Exh. J, Decl. P. Jordan.

8    h.  Mr. Chad Leman is a third-generation hog producer in Woodford

9       County, Illinois. He produces between 90,000 and 100,000 market

10       hogs annually, which he sells under contracts with Tyson and JBS.

11       Mr. Leman houses two-thirds of his sows in group pens that provide

12       about 19 square feet per sow.  These sows are held in farrowing rooms

13       to give birth and wean piglets, and then in individual stalls for

14       approximately thirty-five days after weaning until they are confirmed

15       pregnant, when they are moved into group housing.  Mr. Leman

16       houses the remaining one-third of his sows in individual stalls.  It

17       would be cost-prohibitive for Mr. Leman to convert his individual

18       sow housing to group housing or to remodel his existing group pen to

19       provide 24 square feet per sow, while maintaining the same number of

20       sows.  Because the sows fight each other in the pens and it is more

21       difficult for him to provide care and feed sows according to their

22       needs in the pen, Mr. Leman expects complying with Proposition 12

23       would be disastrous for productivity on his farm and harmful to sow

24       welfare.  Moving sows into the group pens during the vulnerable time

25       directly after weaning would lower conception rates and result in sow

26       injuries.  Because he cannot convert to Proposition 12, Mr. Leman

27       stands to lose business with suppliers because his whole pork product

28       is barred from the large California market.  He is concerned that

1    activist measures such as Proposition 12 will drive him out of the
2    industry.  *See* Exh. K, Decl. C. Leman.

3    i.  Mr. Greg Maher, a hog producer on his small family farm outside of
4        Monroe City, Missouri, produces around 52,000 pigs annually.  He
5        sells many of his pigs to Smithfield, which sells pork in all 50 states,
6        including California.  Mr. Maher converted his sow housing five or
7        six years ago from individual stalls to group pens that provide 16
8        square feet per sow.  As a result of this change, his sow mortality rate
9        skyrocketed and his costs of production increased under the group pen
10       system.  For these reasons, Mr. Maher would like to move back to
11       housing all of his sows in individual stalls as soon as possible.  He
12       now holds only about 40% of his sows in the group pen, and the
13       remaining sows in individual stalls.  For all sows, Mr. Maher makes
14       use of breeding stalls until he confirms that the sow is pregnant in
15       order to allow the embryo to attach before she is moved back into the
16       group pen, where fights between sows risk pregnancy loss.  If
17       required to bear construction costs and productivity losses to comply
18       with Proposition 12, Mr. Maher may have to exit the hog production
19       business.  *See* Exh. L, Decl. G. Maher.

20   j.  Mr. Howard "A.V." Roth is a fifth-generation producer who produces
21       hogs on his family farm located in Crawford County, Wisconsin.  Mr.
22       Roth's farm produces approximately 72,000 weaned pigs annually.
23       While Mr. Roth previously used a group pen, he now houses his sows
24       in individual stalls that provide about 15 square feet per sow.  After he
25       moved from group pens to individual stalls, Mr. Roth's sows
26       experienced far fewer injuries and were much easier to manage.  His
27       average litter size also increased from 9.2 to 10.2 piglets per litter.  If
28       required to comply with Proposition 12, Mr. Roth expects that he

17

would have to pull out of the hog production business, because it would no longer be sustainable for him.  If Mr. Roth moved his sows back to a group pen and eliminated the use of breeding stalls for the first 30 days after breeding as Proposition 12 requires, Mr. Roth expects his productivity rates would plummet.  Mr. Roth would also bear increased labor costs to run his farm, and significant initial construction costs to convert his sow housing.  Because of Proposition 12, Mr. Roth's whole pork product will be barred from sale in the California marketplace.  *See* Exh. C, Decl. H. Roth.

k.  Mr. Randy Spronk is a third-generation Minnesota farmer and hog producer.  Working with his brother, Mr. Spronk produces around 250,000 market hogs annually, mostly under contracts with JBS and Tyson.  He also sells a great deal of his product to Hormel.  While he previously held his sows in group pens, Mr. Spronk was heartsick watching smaller sows get picked on by the dominant animals, and now houses his sows in individual stalls.  Mr. Spronk does not plan to comply with Proposition 12 because Proposition 12's housing requirements would compromise the welfare of his animals, cause productivity rates on his farm to drop, and increase his production costs.  Compliance would also require him to undergo costly construction.  At some of his barns, there would not be enough space for him to expand sow housing to comply with Proposition 12.  Mr. Spronk does not believe that any increased price for Proposition-12 compliant pork in California would recoup his increased production costs, because cuts of pork from his market hogs are shipped to many different end users, most of whom would not value Proposition-12 compliant pork.  Because of Proposition 12, Mr. Spronk's product is

18

1    barred from the California market. Mr. Spronk is concerned about

2    losing business as a result. *See* Exh. M, Decl. R. Spronk.

3    l.  Mr. Joe Hofer is President and Senior Minister of a Hutterite colony.

4    He speaks on behalf of the roughly 30 pork-producing Hutterite

5    colonies located in Montana, most of which rely on hog production as

6    a major source of income. Much of the pork product that comes from

7    the colonies' hogs is shipped into the State of California. Mr. Hofer's

8    colony, along with eight others, contracts regularly to sell pork to a

9    packer who has demanded that the colonies comply with Proposition

10   12 for *all* of the product that they provide to it. This is despite the fact

11   that this packer only sells an estimated one-third of the product it

12   receives from these communities into California. If the colonies do

13   not comply, it will disrupt their business relationship with this packer.

14   Because most of the colonies house sows in individual gestation stalls,

15   changing their practices to comply with Proposition 12 would be

16   incredibly costly. The majority of the colonies would need to reduce

17   their sow populations by 20%. The colonies would also need to

18   purchase 20% more replacement gilts to replace sows that are injured

19   in fights between sows held in group housing. The colonies stand to

20   incur substantial costs if required to comply with Proposition 12. If

21   they do not comply, they stand to lose a longstanding business

22   relationship. *See* Exh. N, Decl. J. Hofer.

23   59.  These farmers' experiences exhibit a common theme: Proposition 12

24   damages producers whose product is or may be sold into California, regardless of

25   whether they choose to comply with Proposition 12 or not.

26   60.  To come into compliance with Proposition 12's stand-up turn-around

27   requirements, along with its 24 square foot per sow requirement, members of

28   NPPC and AFBF who operate sow farms would be forced to immediately expend

19

substantial capital costs to build new group housing that provides 24 square feet per sow, or to retrofit existing barns to provide sows with 24 square feet of space each. *See* Exh. E, Decl. P. Borgic, ¶¶ 27-31; Exh. C, Decl. H. Roth, ¶ 26; Exh. J, Decl. P. Jordan, ¶ 14; Exh. K, Decl. C. Leman, ¶ 12; Exh. H, Decl. T. Floy, ¶¶ 24-25.

61.     One producer, Mr. Borgic, estimates that construction costs to comply with Proposition 12 for his herd of 10,000 sows would reach around three million dollars.  Exh. E, Decl. P. Borgic, ¶ 28.

62.     Another farmer, Mr. Maher, also estimates steep construction costs, as he previously spent a million-and-a-half dollars building a group pen with space for 16 square feet per sow.  Exh. L, Decl. G. Maher, ¶ 17.

63.     Exacerbating these costs, sow housing is a decades-long investment. To reconstruct an existing barn is to waste a significant part of that investment. *See* Exh. M, Decl. R. Spronk, ¶ 18.

64.     Cheaper alternatives, such as constructing a hoop barn that would consist of a concrete floor and a tarp, expose sows to extremely cold weather and cold-related injuries and lack cooling measures to maintain comfortable temperatures in summer.  Exh. G, Decl. M. Falslev, ¶ 34.  Hoop barns are also less efficient, require more labor, and are more expensive to operate. *Id.*

65.     In addition, because they are colder, hoop barns require a great deal of straw bedding and external heating to provide warmth.  Conventional barns, with greater numbers of animals in closer proximity to each other, are warmer and do not require this bedding.  The more bedding provided for warmth, the more manure stacks up, increasing the amount of waste and manure the farm needs to dispose of and spiking labor costs.  Exh. G, Decl. M. Falslev, ¶¶ 32, 34.

66.     In addition to direct construction costs, producers would be required to obtain various permits and comply with state regulatory requirements.  Exh. F, Decl. N. Deppe, ¶ 20; Exh. K, Decl. C. Leman, ¶ 13.

20

67.     During any construction, many producers would need to depopulate their entire sow barn, which would grind production to a halt.  *See* Exh. K, Decl. C. Leman, ¶ 13.

68.     Producers' alternative would be to significantly reduce their production by removing sufficient sows from existing group housing so that each sow has 24 square feet of space.  Exh. J, Decl. P. Jordan, ¶ 14; Exh. E, Decl. P. Borgic, ¶ 31; Exh. I, Decl. T. Hays, ¶ 16.

69.     Removing sows from an existing group pen that provides 16 square feet per sow to allow 24 square feet per sow would reduce sow inventories (and increase average fixed costs) by an estimated 33%.  *See* Exh. O, Decl. S. Meyer, ¶ 13.

70.     For farmers who do not employ group housing, going from 14-square-foot gestation stalls to 24 square feet of pen space per sow would drive an estimated 42% reduction in sow inventory and the same percentage increase of average fixed costs.  *See* Exh. O, Decl. S. Meyer, ¶ 13.

71.     Members would face additional penalties by taking this route.  Many producers operate under years-long contracts with suppliers that obligate them to deliver a certain number of market hogs to each supplier at certain times.  If they miss a shipment, they would be in breach and potentially subject to monetary penalties.  Exh. E, Decl. P. Borgic, ¶ 31; Exh. J, Decl. P. Jordan, ¶ 16; Exh. K, Decl. C. Leman, ¶ 17.

72.     And whether they chose to drastically reduce their sow populations or to bear the exorbitant costs of constructing new sow housing facilities, Proposition 12 would also require farmers to substantially change their animal husbandry practices—methods of caring for sows that they have selected as best for the management of their farms and their animals based on decades of experience.  *See* Exh. I, Decl. T. Hays, ¶¶  8-9.

73.     Proposition 12 effectively requires sows be held in group housing instead of individual stalls, as a sow would need more than 24 square feet to turn around in an individual stall without touching the sides of the enclosure.

74.     These required changes would lower productivity on members' farms. Producers who must move sows from individual stalls and into group pens will experience lower productivity rates because sows in pens fight each other to establish dominance and access to food, leading to serious injuries and fatalities. *See* Exh. E, Decl. P. Borgic, ¶ 12; Exh. C, Decl. H. Roth,  ¶¶ 16-18; Exh. J, Decl. P. Jordan, ¶ 7; Exh. I, Decl. T. Hays, ¶¶  9-11; Exh. F, Decl. N. Deppe, ¶ 18; Exh. K, Decl. C. Leman, ¶ 14; Exh. G, Decl. M. Falslev, ¶¶  2, 24-25; Exh. N, Decl. J. Hofer, ¶ 27.

75.     For example, one member noticed that the sow mortality rate on his farm "skyrocketed" after moving from individual stalls to a group pen.  Exh. L, Decl. G. Maher, ¶ 9.

76.     Producers also expect lower average litter sizes if required to house gestating sows in a group pen given the stress associated with these fights and lower level of care that sows often receive in a group, as opposed to individual, housing system.  Exh. C, Decl. H. Roth, ¶ 21; Exh. F, Decl. N. Deppe, ¶ 19.

77.     Even worse for productivity rates on farms, Proposition 12's restriction on the use of breeding stalls would require producers to move sows into a group pen before pregnancy is confirmed.

78.     As a practice, almost all producers use breeding stalls to artificially inseminate sows and hold them individually at least through the confirmation of pregnancy.  To move the sows prior to the confirmation of pregnancy would increase the risk of pregnancy loss.  Exh. C, Decl. H. Roth, ¶ 22; Exh. I, Decl. T. Hays, ¶ 14; Exh. G, Decl. M. Falslev, ¶ 28.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

79.     Keeping a sow within an individual stall for at least the first five to seven days after breeding is critical to allow the embryos to attach.  Exh. C, Decl. H.  Roth, ¶ 22; Exh. K, Decl. C. Leman, ¶ 16.

80.     And keeping a sow in an individual stall for the first 30 to 40 or so days after weaning and through the confirmation of the next pregnancy guards against the high risk of loss of pregnancy caused by fights.  Exh. J, Decl. P. Jordan, ¶ 12; *See* Exh. I, Decl. T. Hays, ¶ 14; *See* Exh. M, Decl. R. Spronk, ¶ 11.

81.     It also allows sows to recover from weaning, experience reduced stress levels, and receive a proper amount of individualized feed at a time when they are vulnerable.  Exh. J, Decl. P. Jordan, ¶ 12; Exh. F, Decl. N. Deppe, ¶ 16-17.

82.     It is also dangerous to the herd to move sows back into a group pen prior to confirmation of pregnancy.  When sows in heat are returned to a group pen, they may fight or injure other sows by trying to mount or ride them.  Exh. E, Decl. P. Borgic, ¶¶ 20-21.

83.     Because of additional sow injuries and deaths and lower productivity on farms as a result of these requirements, compliance with Proposition 12 would require members to breed additional replacement gilts or sows each year.  Exh. E, Decl. P. Borgic, ¶ 24.

84.     These changes would further disrupt farm management practices, and increase production costs.  Exh. C, Decl. H. Roth,  ¶15; Exh. J, Decl. P. Jordan, ¶¶ 11-12; Exh. I, Decl. T. Hays, ¶¶  13-14; Exh. K, Decl. C. Leman, ¶¶ 14-15; Exh. E, Decl. P. Borgic, ¶¶ 10-17; Exh. G, Decl. M. Falslev, ¶¶ 27-29; Exh. H, Decl. T. Floy, ¶¶ 31-32.

85.     Many producers carefully provide each sow with the right amount of feed to achieve the appropriate body condition, which is difficult in a group housing system and especially critical shortly after weaning.  Exh. J, Decl. P. Jordan, ¶ 12.

86.     While some producers with a group pen utilize an electronic feeding system to provide individualized feed to each sow, these systems are difficult to manage and cost-prohibitive for smaller producers. *See, e.g.*, Exh. J, Decl. P. Jordan, ¶ 12; Exh. L, Decl. G. Maher, ¶ 12; Exh. D, Decl. G. Boerboom, ¶ 37.

87.     It is also more difficult to provide individualized care to sows when they are housed in a group, including providing immunizations, monitoring sows' feed intake, and noticing when sows require medical care. *See* Exh. I, Decl. T. Hays, ¶ 12; Exh. L, Decl. G. Maher, ¶ 12;  Exh. M, Decl. R. Spronk, ¶ 14; Exh. H, Decl. T. Floy, ¶¶ 19.

88.     Housing sows in a group also requires complicated grouping of sows based on their sizes and personalities.  Exh. L, Decl. G. Maher, ¶ 12.

89.     Because of the more labor-intensive nature of group pens, some members would have to hire additional farm hands.  Exh. C, Decl. H. Roth,  ¶ 23; Exh. I, Decl. T. Hays, ¶ 13; Exh. K, Decl. C. Leman, ¶ 15; Exh. E, Decl. P. Borgic, ¶ 33.

90.     Housing sows in a group pen also raises worker safety issues, given the large size of the animals and the need for farm hands to enter the pens with 400 pound animals. *See* Exh. I, Decl. T. Hays, ¶ 11; Exh. M, Decl. R. Spronk, ¶ 15.

91.     Producers carefully manage gilts—young sows that have not yet been bred—to allow them to develop into healthy breeding sows.  Proposition 12 allows gilts to be housed in individual stalls or in group pens in which they have less than 24 square feet of space per gilt until six months of age (or until they are bred, if that is earlier).

92.     But gilts are not usually bred until about seven months of age.  Exh. D, Decl. G. Boerboom, ¶ 27.  A sow farm seeking to comply with Proposition 12 would therefore need to change the way it handles not only its breeding sows, but also its gilts, and would need to ensure that all its replacement sows were Proposition 12 compliant—contrary to current industry practice—during the month

24

or so before first breeding.  Entire herds will have to be replaced from Proposition 12 compliant gilts.  *See* Exh. E, Decl. P. Borgic, ¶ 25; Exh. D, Decl. G. Boerboom, ¶¶ 26-32.

93.     Some compliance methods will be impossible to achieve for farm-specific reasons (*e.g.*, lack of space or permits to build or retrofit barns).  *See* Exh. M, Decl. R. Spronk, ¶ 16.

94.     And for some farmers, the expense of conforming to Proposition 12 will be cost-prohibitive.  Many producers would no longer be able to operate if required to comply with Proposition 12.  *See* Exh. C, Decl. H. Roth, ¶ 28; Exh. F, Decl. N. Deppe, ¶ 22; Exh. K, Decl. C. Leman, ¶¶ 12; Exh. L, Decl. G. Maher, ¶ 17.

95.     This is due to the costs they would expend converting to comply with Proposition 12, reduced productivity on their farms, and increased labor costs as a result of Proposition 12.  *See* Exh. I, Decl. T. Hays, ¶ 17; *see also* Exh. F, Decl. N. Deppe, ¶ 22 (expressing uncertainty as to whether his farm could remain economically viable).

96.     Pork producer members are also concerned that any increased price of pork in California would not offset their increased costs of production from compliance with Proposition 12.  This is because pork product from one hog is cut into primals, meaning different cuts of meat, and then shipped to many different end users across the country and sometimes internationally.  There is no expectation that customers outside of California would see any value in Proposition-12 compliant pork.  But Proposition 12 dictates changes that increase the costs of production for the entire pig, resulting in higher-cost products that are not of higher value to most consumers.  *See* Exh. M, Decl. R. Spronk, ¶ 19.

97.     If producer members do not come into compliance with Proposition 12, they will lose direct access to the California market and stand imminently to lose business with packers that are supplying the California market.  *See* Exh, N,

25

Decl. J. Hofer, ¶ at 19; Exh. J, Decl. P. Jordan, ¶ 12; *See* Exh. I, Decl. T. Hays, ¶¶ 17-18; Exh. F, Decl. N. Deppe, ¶ 21-22; ; Exh. K, Decl. C. Leman, ¶ 18; Exh. M, Decl. R. Spronk, ¶ 17; Exh. H, Decl. T. Floy, ¶ 33.

98.    Some AFBF and NPPC members have already received letters from customers with which they have supply contracts explaining that they expect their suppliers to comply with Proposition 12.  *See* Exh. A-1, Decl. D. Hockman, (Performance Group Food notice).  These producers stand to lose business relationships.

99.    Plaintiffs' members who sell pork into California are also subject to an imminent risk of an enforcement action.  The compliance date for Proposition 12's stand-up, turn-around requirement as applied to out-of-state producers is unclear.  Thus, members who sell pork into California and who are not in compliance with this mandate are exposed to potential enforcement suits.

100.    Some producers have already received letters from animal welfare activists explaining that the activists are aware that most of the pork industry is not in compliance with Proposition 12 and that the activists are committed to ensuring that they comply with Proposition 12.  *See* Exh. A, Decl. of D. Hockman, ¶¶ 12-15.

101.    Other members have been notified that "every US retailer chain has been notified" about Proposition 12 and that the activists "are going to vigilantly ensure that [Proposition 12's requirements] are followed."  *See* Exh. A-3, Decl. of D. Hockman.

102.    Plaintiffs' members involved in every segment of the pork production industry face imminent injury from Proposition 12, because its requirements have a dramatic, negative impact on pork production and the pork supply chain as a whole.  It steeply increases producers' production costs, some of which will be passed along each segment of the supply chain.  And producers who do not comply will need to adjust their businesses to avoid placing pork into a supply chain that does or may result in sales to California.

103.   NPPC and AFBF members who operate farms at any stage of the complex pork production process—for example as piglet nurseries, gilt farms, sow farms, or finishing farms, and the packers who purchase hogs that originated from them—face concrete, imminent injury caused by Proposition 12.

104.   Operations will need to change dramatically for any producer whose product eventually reaches California, and new, difficult tracing methods will be necessary to determine which products do so.

105.   Because of steeper costs, pork products will become more expensive at every step of production and distribution and for the consumer.

106.   And because the industry is not currently capable of supplying enough Proposition 12 compliant pork to California to meet California's demand, pork suppliers stand to lose business and face serious product availability issues, at least in the short term.

107.   These imminent injuries will be redressed by the injunctive and declaratory relief sought in this action.

108.   The interests that NPPC and AFBF seek to protect in this action are germane to the purposes of the organizations.  As organizations that advocate for the economic interests of pork producers nationwide, California's regulation of pork production practices and of the interstate market for pork, as well as its interference with farm management practices, is of vital concern to AFBF and NPPC.

109.   Neither the nature of the claims nor the forms of relief sought in this action require the participation by the Plaintiff associations' individual members. Plaintiffs' facial challenge to Proposition 12 does not require individualized proof and Plaintiffs seek prospective relief.  *See Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

# FACTUAL BACKGROUND

## I. PORK PRODUCTION IN THE U.S.

### A. The U.S. Pork Market

110.   Pork production in the U.S. is an industry that is vital to the agricultural economy and the Nation's overall economy.

111.   In the U.S., approximately 65,000 pork producers market around 125 million hogs per year at a total gross income of around $26 billion annually.

112.   Iowa alone contains nearly 6,000 hog farms.

113.   Other top producing states include North Carolina, Minnesota, Illinois, Indiana, Missouri, Ohio, and Utah.

114.   Pork products include fresh products such as whole cuts, pork chops, ribs, or butts, among many others; processed meat such as sausages; further processed, ready-to-eat items such as smoked and cured products; and cooked items.

115.   Breeding pigs, referred to as "sows," produce market hogs.

116.   Market hogs are raised until they are sent to market, while sows are kept on the farm for the purpose of breeding more market hogs.

117.   Typically, a sow will bear about six parities, or litters, and then be culled, meaning removed from the sow farm and sold.

118.   Only a small amount of product from sows themselves enters the market: About 125 million head of market hogs are slaughtered per year as opposed to just 2 million head of sows.

119.   Almost all sow meat goes into sausage manufacturing, a processed product not subject to Proposition 12.

### B. Pork Producers And The Pork Supply Chain

120.   Pork producers include vertically integrated companies, that is, they own breeding farms, raise gilts to breeding age, raise hogs to market weight in nursery and finishing facilities, slaughter hogs, and process and distribute pork.

121.   Producers also include individual farmers who own facilities at one or more but not at all of these stages of production.

122.   For example, some producers own only breeding farms and sell all or most of their sows' offspring to feeder nursery or finisher farms.

123.   And some packers are vertically integrated while others purchase most of the pigs they slaughter from independent finishers.

124.   Packers operate slaughterhouses and then sell pork product to wholesale or large retail customers who distribute pork to consumers.

125.   Packers may obtain some of their supply of hogs from affiliated producers.  They may obtain other hogs from family farms or other independent producers.

126.   Many pork producers enter into supply agreements with packers, some of which are multi-year contracts, such that very little pork product in the U.S. is sold on the open market.  Producers who contract with packers do not sell directly to wholesalers or consumers.

127.   The number of steps before a product reaches a consumer or business depends on the ultimate purchaser and the amount that a product is processed. Downstream supply chain participants include processors, brokers, distributors, warehouses, retailers, foodservice operators, and other actors.

128.   Pork is a particularly difficult product to trace throughout the supply chain because of the multiple and segmented steps in the production process.

129.   Because the U.S. Department of Agriculture's Food Safety and Inspection Service already inspects pork meat for wholesomeness, the industry does not closely track production details for the vast majority of commodity pork products.

130.   The origin of a market hog is not always clear upon its arrival at packer slaughter facilities.  The animals are segmented for slaughter based on a producer's identity, so hogs that were born and raised on a single farm generally

29

can be traced back to their producers.  But the origin of a hog is often unclear if it is purchased from a producer that only finishes market hogs, and who in turn had purchased the hog after weaning from a different farm.  And while some hogs are purchased from known producers under longstanding contracts, others are bought on the spot market directly at the packing plant.

131.   The housing conditions of the sow from which a market pig came are even more uncertain to packers.  Sow farms often have different barns with different conditions.  And a gilt may have been purchased rather than bred by the sow farm, making the determination of a sow's housing conditions throughout the period it was subject to Proposition 12 even more difficult.

132.   After pork comes out of a packing house, it becomes very difficult to ascertain where pork product came from.  This is because, when pork product leaves a slaughter facility and enters processing, it is often cut into many parts and combined with product from pigs raised by different producers.

133.   It is especially difficult to determine the origin of pork products that are not whole but undergo further processing, such as sausages.  These products run through multiple "touch points" such that tracing the original farm where a product originated becomes extremely difficult.

134.   To determine if pork product is Proposition 12 compliant, the entire product line would need to be segregated.

135.   This burden to segregate product will fall on farmers at every stage of pork production as well as packers.

**C. The Steps Involved In The Production Of Pork**

136.   Pork production in the U.S. is complex and driven by herd health and efficiency considerations.

137.   Throughout the production process, pigs are carefully grouped to form herds with similar health status.  This minimizes the need for treatment with

vaccines or antibiotics. Producers also keep pigs in groups of the same age and with a similar diet.

138.   For herd health reasons as well as economies of scale, the production process is segmented.  This means that most farms hold pigs at a specific phase or phases in the production process, and they are moved between farms as they develop.

139.   Breeding farms contain sows, female pigs that produce piglets.

140.   Farms strive to locate sow breeding farms in isolated areas with low concentrations of pigs.  Their remote location is a biosecurity measure to protect sow herds from disease.  Biosecurity is a set of preventive measures to help avoid the transmission of infectious diseases in livestock.

141.   Sows deliver piglets in farrowing stalls on breeding farms.

142.   After being weaned at about 21 days in the farrowing stall, piglets are moved away to nursery farms in a separate location.  These locations are often removed from breeding farms for biosecurity and other concerns.

143.   Piglets are kept in nursery farms until they weigh approximately 50 pounds at about 6-8 weeks, at which point they are referred to as "feeder pigs" and are transferred to separate finishing facilities.

144.   Pigs spend 16-17 weeks at a finishing farm, where they develop and gain weight before being sent to markets and packers, where they are slaughtered.

145.   A small percentage of farms are structured as "wean to finish," meaning that pigs are held at the same farm rather than transferred between farms as they develop throughout the production process.

**D. Sow Housing At Breeding Farms**

146.   A breeding farm houses sows that are bred, usually by artificial insemination, to produce piglets.

147.   Determining how to house sows is a critical farm management decision.

31

148.   Sow housing affects the ability of farm management to provide appropriate care to sows, maintain sow and herd health, and appropriately sequence sows through farrowing stalls where they give birth, and it is critical to farm productivity.

149.   Thus, at breeding farms, many production and animal welfare considerations go into determining how to house sows.

150.   Most types of sow housing fit into one of two categories: individual or group housing.

151.   Individual stall housing is the most common housing method in the industry.  Individual stalls may be referred to as "breeding stalls," meaning individual stalls where a single sow is held after weaning piglets until confirmation of another pregnancy, or as "gestation stalls," meaning individual stalls where a single sow is held after confirmation of pregnancy.

152.   Individual stalls typically provide around 14 square feet per sow.  *See* Exh. O, Decl. S. Meyer, ¶ 11.

153.   Individual stalls serve important animal health and efficiency purposes, because when using breeding and gestation stalls, it is easier to feed, treat, and observe sows.

154.   Throughout breeding and gestation, producers typically confine sows to these individual stalls.

155.   The stalls prevent a sow from turning around, such that a pig is fed only at one end of the stall and defecates only at the other end.  This prevents the sow from eating feces.

156.   The stalls allow the sow individual access to critical resources, including water and feed, without competition from other sows.

157.   And they facilitate nutrition tailored to the needs of the individual sow to recover peacefully from the stress and strain of delivering and nursing their previous litter and allow the sows to regain body weight and prepare to be re-bred.

158.   Individual stalls also provide a sow with easy access to veterinary care.

159.   They further protect sows from aggression and injury from other sows.

160.   Consumer demands from purchasers of pork to increase space for sows during gestation has led roughly 28% of the industry to convert from individual gestation stalls to group housing.

161.   Group housing for sows is defined as a housing environment for more than one sow in which the sow has the ability to lie down and stand up and to turn around unimpeded.

162.   Group housing generally provides around 16 to 18 square feet per sow.  *See* Exh. O, Decl. S. Meyer, ¶ 11.

163.   Many variables can negatively impact sow welfare and productivity when they are held in groups rather than individual stalls.

164.   It is more difficult for producers to identify and remove sick sows for medical care in group housing, and to ensure that each sow receives appropriate nutrition tailored to its individual needs to achieve and maintain a healthy body condition.

165.   Group housing systems increase the chance that a sow will be injured from aggressive interactions with other sows.  Anytime a new group of sows is formed, there will be significant stress and injuries, because the sows will fight to establish their social order in group housing.

166.   Sows also compete for feed in group housing, which risks dominant sows becoming overweight and subordinate sows becoming underweight.

167.   The welfare of sows held in group housing depends more heavily than that of sows held individually on the care and skill of the producers who tend to them.

168.   Farm management using group housing must make a variety of decisions to attempt to alleviate this aggression among sows and to ensure that sows receive appropriate nutrition.

169.   This requires flexibility in housing type and design to appropriately care for and ensure the productivity of sows held in group pens.

170.   As an example, producers select peer groups of sows based on both the size of their operation and how sows will fit into farrowing room sequencing when they give birth and nurse piglets.

171.   The size of the group may range from five to more than 100 sows per pen.

172.   Producers must also consider whether the group-housed sow population will be dynamic, meaning that different sows will be regularly added or removed from the group to retain stocking levels in pens, or static, meaning that the same group of sows will be kept together.

173.   Another factor managers consider is the feeding system employed. The choice of feeding method is critical in group housing because the producer is not able to tailor the nutrition provided to each sow as with individual stalls.  The system employed can also influence the level of aggression and competition between sows for feed.  The appropriate feeding system will be influenced by the size and make-up of the group, as well as the size of the pen.

174.   Feeding practices range from floor feeding, meaning that feed is simply dropped on the floor at one time; feeding in free access stalls, which allow sows to enter stalls that close behind them to eat individually; electronic sow feeding systems, which can be employed in larger pens where sows are directed to eat and given an individualized ration based on a tag on the sow's ear; and "trickle" feeding, meaning that feed is slowly released into feeding sites.

175.   The type of flooring used is another decision that can impact hygiene and sow injuries.  While solid flooring with bedding can increase sow comfort, slatted flooring to clear away manure can improve hygiene.

176.   Another housing permutation is whether to provide free access stalls within the group housing.  When a sow voluntarily enters a free access stall, the stall will close behind the sow and prevent other sows from entering.  The sow within the free access stall cannot turn around, but it can voluntarily leave the stall by backing out.

177.   All of these factors will impact sows' ability to avoid aggressive encounters that could result in injury and reduce farm productivity.

178.   Producers require flexibility in housing design to make these decisions.

179.   The "best" housing design, including space per sow, will depend on the interplay between each of the above factors as well as producer experience and preferences.

180.   Housing features that work well for one producer may fail to secure sow welfare and negatively impact sow productivity in a different setting.

**E. The Importance Of Individual Stalls During Breeding And Gestation**

181.   The overwhelmingly vast majority of producers, even if they use group housing at other stages, hold sows in individual breeding stalls for approximately 30 to 40 days between the time a sow finishes weaning through the time it enters estrus, it is bred, and pregnancy is confirmed.

182.   After weaning piglets for about 21 days, a sow will generally enter estrus five to seven days later.

183.   Once a producer confirms that a sow has entered estrus, the sow will be bred, typically by artificial insemination.

184.   Pregnancy is confirmed around 21 days later.

185.   The use of breeding stalls for around 30 to 40 days after weaning is a widely accepted industry practice that is endorsed by veterinarians.

186.   It is also critical to managing sows for breeding and productivity.

187.   Breeding stalls assist producers with detecting when a sow is in estrus to determine when it is time to breed the sow.

188.   Commonly, producers will expose sows to a boar to assist with estrus detection by walking a boar along the side of the pen or stalls.

189.   It is much more difficult to ensure that each sow is adequately exposed to the boar in order to detect estrus in a group pen setting as compared to individual stalls.

190.   Additionally, the separation of sows into individual stalls during estrus reduces the risk of injuries to sows and to human caretakers.

191.   A sow's normal behavior during this time period is to attempt to mount or ride other sows, which can place farm workers at great risk of injury. Thus, keeping sows in group settings during this time presents safety concerns.

192.   Use of breeding stalls after implantation and prior to confirmation of pregnancy ensures that the embryo properly attaches.

193.   It also guards against the risk of the loss of pregnancy or a drop in litter size due to the stress of socialization in the group setting, as well as the risk of aggression from other sows.

194.   Sows in stalls do not face the risk of aggression or jostling that occurs in group settings.

195.   Sows placed immediately in a group housing setting after weaning have lower conception rates.

196.   Breeding stalls also assist producers in confirming that the sow is pregnant. It is challenging in a group-housing setting to detect whether a sow is pregnant. While producers can use ultrasound technology, the ability of the sow to move around in a pen complicates the confirmation of pregnancy. Even with

36

ultrasound technology, it is difficult to confirm pregnancy prior to 30 or 40 days after breeding.

197.   Production management also benefits greatly from the ability to keep a sow in a stall until confirmed pregnant such that, if the sow does not conceive, it can be easily re-bred once it returns to estrus.

198.   After pregnancy is confirmed, some pork producers transfer sows to group housing.

199.   Of these sows, some will not adapt healthily to the group setting and will be moved back to an individual stall.

200.   As a farm management decision, most producers elect to hold sows continually in breeding or gestation stalls throughout pregnancy rather than to move sows into group housing facilities after pregnancy is confirmed.

201.   Although the first several weeks after breeding are most critical and present the highest risk of embryo mortality, stress from a group setting at any stage of the production process may result in a pregnancy loss.

202.   Breeding stalls protect gestating sows from aggression that is common when sows are moved from stalls into a group housing setting.

203.   When mixed into groups, sows experience increased levels of fighting, cortisol, lameness, and body and vulva lesions as compared to sows housed in stalls.  These conditions directly erode animal health.

204.   The worst parts of this aggression occur for the first several days while the sows establish their social order.

205.   Producers report a higher rate of injuries and fatalities in group than in individual housing.

206.   Breeding stalls also enable farm managers to provide each sow with the proper nutrition during gestation.  Producers can better ensure that sows that lost weight during lactation or those that have excessive body weight receive the correct amount of feed when they are housed in individual stalls.

## II. PROPOSITION 12

### A. The History Of Proposition 12

207.   On November 6, 2018, California voters approved Proposition 12, a ballot initiative that amends the California Health and Safety Code with prescribed requirements for housing covered farm animals, including breeding pigs, calves raised for veal, and egg-laying hens.

208.   Proposition 12 was drafted and sponsored primarily by the HSUS as well as supported by various other animal rights activists.

209.   Proposition 12's requirements were driven by activists' conception of what qualifies as "cruel" animal housing, not by consumer purchasing decisions or scientifically based animal welfare standards.

210.   The Proposition states that its "purpose … is to prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of California consumers, and increase the risk of foodborne illness …."

211.   Proposition 12's requirements add to and amend those previously imposed by another ballot initiative, Proposition 2, titled *Standards for Confining Farm Animals*, which was also sponsored by the HSUS.

212.   Passed November 4, 2008, Proposition 2 imposed animal housing requirements *on California producers* based on activists' conception of ideal animal housing.

213.   Proposition 2 required that egg-laying hens, breeding pigs, and calves raised for veal *in California* must be housed in a manner that allows the animals to "turn around freely, lie down, stand up, and fully extend their limbs," subject to limited exceptions.

214.   The effective date of Proposition 2 was January 1, 2015, over six years after Proposition 2 passed.

215.   To come into compliance, Proposition 2 obligated California producers to undergo major, costly changes in their production practices that required millions of dollars' worth of investments in capital improvements to their animal housing facilities.

216.   Recognizing the economic impact Proposition 2 would impose on California producers and eager to level the playing field, the California legislature enacted Assembly Bill 1437 (AB 1437).

217.   AB 1437 exported Proposition 2's requirements to apply to all sales of eggs in California, even if the eggs were produced entirely outside of California. AB 1437 also had an effective date of January 1, 2015.

218.   AB 1437 did not apply to pork.

219.   AB 1437 was subject to legal challenge by six states as in violation of the Commerce Clause of the U.S. Constitution, but the lawsuit was dismissed for lack of *parens patriae* standing.

220.   Through Proposition 12, activists have now imposed even more stringent requirements for housing to an expanded range of farm animals, to the detriment of animal health and the success of small family farms.

221.   Proposition 12 redefines supposedly "cruel" animal confinement, dictating the amount of space and type of housing that producers must provide to breeding pigs, calves raised for veal, and egg-laying hens.

222.   This time, activists drafted the ballot initiative so as to require *all* producers to follow the requirements of Proposition 12 in order for their products to be sold in California, regardless of whether the product was produced inside or outside of California.

223.   Thus, their intent was to have Proposition 12 impose an extra-territorial effect on interstate commerce.

224.   Indeed, multiple statements confirm the activists' intent to reach out-of-state production through Proposition 12, as well as their awareness of Proposition 12's extraterritorial impact.

225.   For example, in an editorial to support passage of Proposition 12 sponsored by a committee of HSUS, the activists explained that California does not have a sizable pork industry, and that the proposition would ban sales from other states not meeting California's standards.  "Editorial: Vote Yes on Prop. 12 to Give Farm Animals a Cage-Free Life," *Mercury News* (September 4, 2018), https://perma.cc/45Y7-WVFX.

226.   HSUS officials and other activists explained how Proposition 12 would have an out-of-state impact, forcing producers outside of California to meet its "historical" standards in order to reach the California market.  *See, e.g.*, Charlotte Simmonds, "'History in the Making': California Aims for World's Highest Farm Animal Welfare Law", *The Guardian* (March 7, 2018), https://perma.cc/6RL3-99ZL (The vice-president of farm animals protection for HSUS claims that Proposition 12 "is history in the making"); Anna Keeve, "Farm Animal Rights Bill, Proposition 12: Everything You Need to Know", *LA Progressive* (August 30, 2018), https://perma.cc/6G64-AHUZ, (Humane League activist states that Proposition 12 "has the potential to be the biggest legislative victory for animals in history, not just in the state but in the country."); *see also* Nicole Pallotta, "Wins for Animals in the 2018 Midterm Election", *Animal Legal Defense Fund* (January 5, 2019), https://perma.cc/J7T5-98XP (Proposition 12 is "being called the strongest law of its kind in the world").

227.   Thus, as is the intent behind Proposition 12, producers outside of California who wish to sell in the California market must comply with Proposition 12.

228.   A report regarding Proposition 12 prepared by the Legislative Analyst Office for the Attorney General for the State of California (LAO Report) also

recognized that Proposition 12 inevitably regulates extraterritorial conduct with regard to pork.  The LAO Report explained that most of the pork that Californians purchase is produced in other states.

229.   The LAO Report further anticipated that in response to Proposition 12, California farmers would stop or reduce their production, potentially causing a decrease of millions of dollars of state tax revenue that California collects annually.

230.   In addition, the LAO Report explained that consumer prices for pork would likely increase as a result of Proposition 12.

231.   The LAO Report explained that Proposition 12 will require many producers—including those "in California **and other states**" —to remodel existing housing or build new housing for animals to satisfy the new definition of "cruel" animal confinement.

232.   Further, the LAO Report explained that it could take several years for producers to change their housing systems to come into compliance with Proposition 12.  Demand for Proposition 12-compliant products in California would outpace supply.

233.   The LAO Report also anticipated a $10 million cost to California annually in ensuring that products sold in California, whether produced in-state or out-of-state, comply with Proposition 12.

234.   The LAO Report did not quantify the costs that Proposition 12 imposes outside of California.

235.   Because Proposition 12 was a ballot initiative, it passed without legislative debate or legislative hearings to investigate the impact it would have on interstate commerce, on the pork industry, or on sow welfare.

236.   Proposition 12 passed with approval of 62.66% of participating California voters.

### B. Proposition 12's Space Requirements As Applied To Breeding Pigs

237.   Proposition 12 prohibits "confining [breeding pigs] in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs, or turning around freely."

238.   This means that a sow must be able to fully extend all of its limbs "without touching the side of an enclosure or another animal," and must be able to "tur[n] in a complete circle without any impediment, including a tether, and without touching the side of the enclosure or another animal."

239.   These requirements mean that meat from the offspring of sows housed in individual stalls may not be sold in California.

240.   Proposition 12 permits only narrow exclusions from this requirement that breeding pigs not be housed in individual stalls.  Individual stalls may be used:

    a.  for five days before a breeding pig is expected to give birth, and any day a pig is nursing piglets;

    b.  for animal husbandry purposes, limited to six hours in any 24 hours, and not more than 24 hours in any 30 days;

    c.  for "examination, testing, individual treatment, or operation for veterinary purposes";

    d.  for medical research; and

    e.  during transportation, during shows, during slaughter, at establishments where federal meat inspection takes place, and at live animal markets.

241.   These exclusions do not allow the housing of sows in individual breeding stalls to detect estrus or to ensure that a pig is pregnant and that the eggs have properly attached.

242.   They also do not allow a sow to recover peacefully from the strain of delivering and weaning her last litter of piglets, protected from fighting and competing against dominant and aggressive sows.

42

243.   Subject to the same narrow exceptions, Proposition 12 also prohibits, after December 31, 2021, "confining a breeding pig with less than 24 square feet of useable floor space per pig."  "Usable floor space" is defined as the total square footage of floor space divided by the number of animals in the enclosure.

**C. Proposition 12's Space Requirements As Applied To Gilts**

244.   Proposition 12's requirements apply to breeding pigs, which it defines as "any female pig of the porcine species kept for the purpose of commercial breeding who is six months or older or pregnant."  Gilts which are not pregnant are therefore exempt until they are six months old.

245.   However, standard industry practice is not to breed gilts until they are about seven months old.

246.   Accordingly, gilts over six months old must be housed in compliance with Proposition 12.

247.   Virtually no gilts currently are housed that way.

248.   Many sow farms raise their own gilts.  Others buy their sows, or some sows, from gilt producers.

249.   In order to be Proposition 12 compliant, even a sow farm that complied with Proposition 12 for its breeding pigs would also need to ensure that all its sows were raised as gilts in compliance with Proposition 12.  And currently non-compliant herds would need to be entirely replaced using compliant gilts.

**D. The Scope Of Proposition 12**

250.   Proposition 12's requirements apply to sales of covered products in California even if the product derives from a farm animal raised entirely outside of California.  Specifically, covered products from a breeding pig or from the offspring of a breeding pig cannot be sold in California if the breeding pig was ever confined in conditions that do not satisfy Proposition 12.

251.   This restriction covers business owners and operators who know or should know that covered product does not comply with Proposition 12.

43

252.   There is a defense to a violation of Proposition 12 if the seller proves that it did not know, and should not have known, that the product was from an animal that did not meet Proposition 12's confinement mandates, or if the seller proves that it relied in good faith upon certification "by the supplier" that the product was not from an animal confined in conditions that fail to meet Proposition 12's requirements.

253.   The products covered by Proposition 12 are uncooked, whole pork meat comprised entirely of pork intended for human consumption.

254.   "Whole pork meat" means any uncooked cut of pork that is comprised entirely of pork meat, or of pork meat with very basic additives, such as seasoning, curing agents, coloring, and preservatives.  Examples of covered products include "bacon, ham, chop, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin, or cutlet."

255.   This definition "does not include combination food products" that consist of more than pork meat and such basic meat additives, such as "soups, sandwiches, pizzas, hot dogs, or similar processed or prepared food products."

256.   In the industry, a "processed" product generally refers to a product that is ready to eat and need not be cooked for food safety reasons.

257.   A covered sale is the commercial sale of a covered product in California, deemed to occur where the buyer takes physical possession of the item. It does not include sales that occur at facilities that are federally inspected pursuant to the Federal Meat Inspection Act.

258.   Because there is no exclusion for pork raised outside the country, Proposition 12 applies to foreign producers as well as the entire U.S. pork market.

**E. Implementation Of Proposition 12**

259.   A sale of pork in California that does not comply with Proposition 12 is a criminal offense that carries a penalty of up to a $1,000 fine or 180 days imprisonment.

260.   A violation is also defined as "unfair competition" under the California Business & Professional Code § 17200.  This definition subjects a seller to a civil action for damages or injunctive relief by any person injured in fact by the violation.

261.   Proposition 12 charges the CDFA and the CDPH with jointly promulgating regulations to implement Proposition 12.

262.   The CDFA is in the process of developing this regulatory framework. Proposition 12 required CDFA and CDPH to produce final regulations by September 1, 2019.

263.   On April 2, 2019 the CDFA issued a Notice of a Request for Information.

264.   CDFA explained that Proposition 12's implementing regulations may include "production facility registration, certification, verification audits or inspections, border station inspection, and a penalty matrix for violations including an appeal process."

265.   On June 3, 2019, Plaintiffs AFBF and NPPC submitted comments in response to the CDFA's Request for Information.  In these comments, the NPPC explained that the production of pork in the U.S. is driven by a complex industry that is vastly different from the egg and dairy industries.

266.   Both Plaintiffs further explained that the arbitrary housing requirements in Proposition 12 have no connection to animal welfare, that the costs of compliance will force producers to choose between incurring untenable compliance costs or losing access to the California market, and that Proposition 12 violates the Commerce Clause.

267.   As of the filing of this lawsuit, no regulations have been promulgated.

**F. The Proponents' Justifications For Proposition 12**

268.   The purported justifications for the section of the California Health and Safety Code that Proposition 12 amends is to "prevent animal cruelty by

45

phasing out extreme methods of farm animal confinement, which also threaten the health and safety of California consumers, and increase the risk of foodborne illness and associated negative fiscal impacts on the State of California."

269.   The Proposition 12 Official Voter's Guide did not explain how Proposition 12 has anything to do with pork product safety.  And its discussion of animal cruelty with regard to pork production reflected a misunderstanding of industry practices.

270.   Proponents of Proposition 12 stated in the Voter Guide:  "Voting YES prevents . . . mother pigs . . . from being crammed inside tiny cages for their entire lives.  It will eliminate inhumane and unsafe products from these abused animals from the California marketplace.  Voting YES reduces the risk of people being sickened by food poisoning . . . ."

271.   In the Voter Guide proponents also stated:  "A mother pig shouldn't be locked in a tiny, metal cage where she can barely move.  She's trapped, forced to live in this small amount of space for *nearly four years.*"

272.   Proponents also stated in the Voter Guide:  "Scientific studies repeatedly find that packing animals in tiny, filthy cages increases the risk of food poisoning."

273.   These proponent statements in support of Proposition 12 in the Voter Guide that concern breeding pigs are inaccurate. They arise from misconceptions about the industry and housing practices.

274.   The proponents did not explain why 24 square feet per sow are needed to prevent animal cruelty, or have anything to do with it.

275.   Their arguments relied on inaccurate depictions instead of prevailing industry standards of space provided per sow.

276.   They made no reference to the reasons for the use of breeding stalls, or the ways and periods in which breeding stalls are used.

277.   And they did not explain or point to scientific studies that show how sow housing can affect public health when the pork sold to consumers comes almost exclusively from pigs raised and slaughtered in other facilities.

278.   The proponent statements in the Voter Guide are inaccurate, and fail to take into account the benefits to animal health of limiting group housing of sows.

## III. PROPOSITION 12 REGULATES WHOLLY OUT-OF-STATE CONDUCT

### A. Proposition 12 Requires Massive Changes In Pork Production Practices Nationwide

279.   A 24-square-foot-per-sow requirement and severe restriction on—indeed almost complete elimination of—the use of breeding stalls is entirely inconsistent with current industry best practices.

280.   While a handful of states have passed laws requiring that pregnant or gestating sows be confined in conditions that permit them to stand up, fully extend their limbs, and turn around, Proposition 12's ban on breeding stalls prior to pregnancy and its square-foot-per-sow requirement are singular in the U.S.

281.   Even more, these other state regulations that require stand-up turn-around have only imposed these requirements on in-state producers.  Only Massachusetts has passed a law that, once in effect, will similarly export its requirements to out-of-state producers.  That law was also passed via ballot proposition, and lacked any semblance of legislative investigation, debate, or deliberation.

282.   Agreed-upon industry standards developed in collaboration with veterinarians and other industry stakeholders recognize that a variety of housing systems can adequately provide for the welfare of sows and do not require one type of housing system, let alone set one prescriptive space-per-sow numerical requirement or end the use of breeding stalls.

47

283.   Compliance with Proposition 12 will require massive changes in production practices nationwide.

284.   Although approximately 28% of the U.S. market houses sows in group housing systems, only a miniscule portion meets all of the housing requirements prescribed by Proposition 12.  Exh. A, Decl. D. Hockman, ¶ 9.

285.   Of the approximately 28% of the market that uses group housing, those facilities generally house sows with anywhere from 16-18 square feet per sow.  *See* Exh. O, Decl. S. Meyer, ¶ 11.

286.   Approximately 72% of U.S. pork producers house sows in individual stalls throughout gestation.  Exh. A, Decl. D. Hockman, ¶ 9.

287.   The overwhelmingly vast majority of producers typically use individual breeding stalls for the first 30 to 40 days between the time a sow finishes weaning through the time it enters estrus, is bred, and pregnancy is confirmed.  Exh. A, Decl. D. Hockman, ¶ 9.

288.   None of these pork producers are in compliance with the stand-up turn-around requirements or the 24-square-foot-per-sow group housing space requirement of Proposition 12.

289.   Demonstrating the massive changes that Proposition 12 requires, almost the entire industry is out of compliance with Proposition 12.

**B. By Dictating Producers' Production Practices Outside Of California, Proposition 12 Disrupts The Interstate Pork Supply Chain**

290.   The inevitable effect of Proposition 12 is to regulate out-of-state production.

291.   Proposition 12 targets an industry whose production occurs almost entirely outside of California, in other states and countries.

292.   California's consumption of pork is hugely disproportionate to its production.  California consumes about 13% of the pork sold in the U.S.  But pork production inside California is minimal.  There are approximately 8,000 sows in

48

California, and only approximately 1,500 of those are in commercial production. Yet, California annually consumes the pork from approximately 673,000 sows.

293.   Accordingly, the inevitable effect of Proposition 12 is to project California's required methods of production into other states and countries that allow different methods of production, and to force costly and unwanted changes in production methods that producers believe are both inefficient and harmful to their sows.

294.   The extraterritorial reach of Proposition 12 is a substantial barrier to interstate commerce, which functions through a well-established and complex supply chain in which virtually no participant is Proposition 12 compliant.

295.   Proposition 12 will remove from the California market pork product derived from the offspring of sows whose producers provide for animal welfare but do not meet Proposition 12's prescriptions.

296.   Out-of-state producers must submit to California's mandated production methods or lose access to California's large market.

297.   In addition, because of the difficulty of tracing pork products back to sows and gilts housed in particular facilities, Proposition 12 disrupts the entire U.S. pork chain of supply.  Absent tracing individual cuts of whole pork product throughout that chain of supply back to particular sow facilities (indeed, particular sow housing), and segregation of any Proposition 12 compliant hogs and individual pork meat cuts at slaughter and processing facilities, it will be impossible to sell any commercially produced pork into California.

298.   As an alternative to tracing and segregation, producers will be forced to change their production practices for pork intended for other, non-California markets in order to make all of their production Proposition 12-compliant.

299.   End of chain suppliers who sell pork into California will likely force their pork suppliers to produce *all* product they provide to those suppliers in compliance with California's specifications, or to carefully segregate products.

300. Furthermore, some buyers will require that all products they receive from suppliers meet the same specifications and therefore avoid the need to segregate products. *See, e.g.*, Exh. N, Decl. J. Hofer, ¶¶ 18-21 (explaining that a packer with whom nine Hutterite colonies contract demanded that the colonies meet California's specifications for all pork product they sell to it); Exh. A, Decl. D. Hockman, ¶¶ 16-19.

301. Thus, even sow farms developing all or most of their product primarily for sale outside of California will likely be required to meet Proposition 12's strictures in order to sell their products to packers who supply those customers.

302. Confirming the extraterritorial nature of Proposition 12, it is impossible to conceive how CDFA will ensure compliance with Proposition 12 unless it certifies facilities in other states through direct field verification audits or inspections by state employees or third party auditors. Indeed, CDFA explains on its webpage regarding the implementation of Proposition 12 that certification and verification audits are among the methods it is considering for policing compliance.

303. By imposing drastic changes in production on an industry that is national in scope, and in which whole cuts of pork are shipped around the country, Proposition 12 interferes with the functioning of $26 billion a year in interstate commerce.

304. By imposing drastic changes that regulate how producers house sows in other states, California is directly challenging the sovereignty of other states to regulate their own citizens' animal husbandry practices.

## IV. PROPOSITION 12 IMPOSES AN EXCESSIVE BURDEN ON INTERSTATE COMMERCE

### A. Proposition 12 Imposes Substantial Costs On Out-of-State Producers

305.   The overwhelmingly vast majority of the market is not in compliance with Proposition 12.

306.   Producers who attempt to alter their practices to comply with Proposition 12 face severe and costly burdens.

307.   To come into compliance with Proposition 12, the minority of producers who currently use group sow housing will need to decrease their production by removing sows from barns until the 24 square foot requirement is met, retrofit barns to increase available group housing space, or build new group housing barns, all with no corresponding financial benefit.  Exh. F, Decl. N. Deppe, ¶ 20; Exh. K, Decl. C. Leman, ¶ 12; Exh. J, Decl. P. Jordan, ¶ 14.

308.   Farms with group housing currently provide around 16-18 square feet per sow.  These farms will need to reduce their sow inventories by 33% to come into compliance with Proposition 12.  *See* Exh. O, Decl. S. Meyer, ¶ 13.

309.   To comply with Proposition 12, producers who currently use individual sow housing will need to reduce their sow inventory by 42%, or build new or convert existing barns to group sow housing that provides 24 square feet per sow.  *See* Exh. O, Decl. S. Meyer, ¶¶ 13, 14; Exh. E, Decl. P. Borgic, ¶ 31; Exh. C, Decl. H. Roth, ¶ 26.

310.   In addition to the direct costs of renovation and reconstruction, the process will also require producers to shut down their existing farms while the farms are retrofitted.  *See, e.g.*, Exh. H, Decl. T. Floy, ¶ 28; Exh. K, Decl. C. Leman, ¶¶ 13.

311.   New construction costs will for some hog producers reach millions of dollars, and those costs will be in addition to any costs that some producers have already incurred in prior barn renovations transitioning to group housing.

51

312.   As an example, Smithfield, a vertically-integrated pork processor and hog producer, already spent $360 million over a ten-year period to convert from individual stall housing to group housing.  *See* Decl. of Robert Darrell, *North Am. Meat Inst. v. Becerra, et al.*, 2:19-cv-08569-CAS, Dkt. 15-7 (C.D. Cal. Nov. 18, 2019).  Smithfield estimates that retrofitting its barns to meet Proposition 12's 24–square-feet-per-sow requirement for all of its company-owned sows would in turn cost an additional $100 million in capital investments and increased operating costs.  *See* Decl. of Robert Darrell, *North Am. Meat Inst. v. Becerra, et al.*, 2:19-cv-08569-CAS, Dkt. 15-7 (C.D. Cal. Nov. 18, 2019).  Clemens, a vertically coordinated company that produces, processes, and distributes pork, estimates that restructuring its company-owned sow farms as well as those of its suppliers to comply with Proposition 12 would require a capital investment of over $45 million.  *See* Decl. Joshua Rennells, *North Am. Meat Inst. v. Becerra, et al.*, 2:19-cv-08569-CAS, Dkt. 15-9 (C.D. Cal. Nov. 18, 2019).

313.   Smaller operations also face steep construction costs and have less ability to meet them.  Illinois hog producer Mr. Borgic estimates that construction costs to comply with Proposition 12 for his herd of 10,000 sows would reach around $3 million.  Exh. E, Decl. P. Borgic, ¶ 28.  Missouri hog producer Mr. Maher explains that he previously spent $1.5 million building a group pen with space for 16 square feet per sow.  Exh. L, Decl. G. Maher, ¶¶ 7,17.

314.   Some farms will not have the capital available to meet these costs. *See* Exh. O, Decl. S. Meyer, ¶ 16.

315.   Permits to construct new or retrofit existing barns are difficult to obtain in many states and restricted by state regulation.  Available space for new facilities is also limited by zoning regulation, and often subject to significant construction or litigation delays.

316.   Producers that elect to undergo these steep construction costs will need to secure financing, which will also likely require them to negotiate revised, long-term contracts with suppliers.  Exh. F, Decl. N. Deppe, ¶ 20.

317.   The timeline for producers to come into compliance with Proposition 12's spacing requirements is abbreviated and requires action now.  Exh. C, Decl. H. Roth, ¶ 10.

318.   Before beginning construction, producers will need to consult with equipment manufacturers and experts regarding how to design the group housing and select appropriate equipment and fixtures.  Exh. H, Decl. T. Floy, ¶¶ 26-33.

319.   Producers who intend to retrofit or build new barns to meet Proposition 12's 24-square-foot-per-sow requirement by the December 31, 2021 deadline would likely have needed to start planning and contracting for construction during 2019.

320.   By early 2020, pork producers who intend to construct new barns or retrofit their facilities will need to begin construction on new sow housing units.

321.   Thus, Plaintiffs' members must begin retrofitting or constructing new barns to come into compliance now, or be prepared to lose certain customers and access to the California market.  Exh. C, Decl. H. Roth, ¶ 10.

322.   Compliance with Proposition 12 will require entirely new and less efficient methods of animal husbandry that will increase operating, staff training, and veterinary costs.

323.   Proposition 12 significantly interferes with production by taking farm management practices out of the hands of the farmers who are most informed about animal care.  The impact of this intrusion will also jeopardize animal health (as previously explained), increase production costs, and decrease productivity. Exh. C, Decl. H. Roth, ¶¶ 15-26; Exh. J, Decl. P. Jordan, ¶¶ 12-14; Exh. I, Decl. T. Hays, ¶¶ 9-10, 14; Exh. K, Decl. C. Leman, ¶¶ 14-16; Exh. E, Decl. P. Borgic, ¶¶ 10-22; Exh. G, Decl. M. Falslev, ¶¶ 27-29; Exh. H, Decl. T. Floy, ¶¶ 16-18.

53

324.   Proposition 12 eliminates the use of breeding stalls on which the vast majority of producers rely for managing the breeding of sows based on generations of experience.  Those farmers will need to completely change their methods of operation to accommodate sows in estrus and during breeding and early pregnancy in group housing, which will require changes in the sow population and/or in the physical plant.

325.   Proposition 12 will also require virtually all farms to change the way they acquire or raise and first breed gilts.

326.   In an expedited timeframe, Proposition 12 upends generations of animal husbandry, training, and knowledge.

327.   It will be significantly more difficult for producers to oversee the production process with restricted breeding stall use.

328.   It will be much more difficult for many producers to artificially inseminate their sows under the limited animal husbandry exceptions permitted under Proposition 12.  *See* Exh. I, Decl. T. Hays, ¶¶ 9-10.

329.   Sow productivity will drop and sow injuries will increase without farm management's ability to place sows in breeding stalls during estrus, implantation of the embryo, and confirmation of pregnancy.  Exh. C, Decl. H. Roth, ¶¶ 22; Exh. I, Decl. T. Hays, ¶ 14; Exh. G, Decl. M. Falslev, ¶ 28.

330.   Producers will need to expend resources to provide additional training to stockpersons on how to properly care for gestating sows held in groups rather than individual stalls.  Exh. I, Decl. T. Hays, ¶¶ 12-13; Exh. K, Decl. C. Leman, ¶ 15; Exh. E, Decl. P. Borgic, ¶ 33.

331.   Stockpersons will need to be differently trained to recognize sows that require specific nutrition or care and remove them from a group housing setting, and to confirm more carefully when a sow is in estrus or whether a sow is pregnant.  Exh. I, Decl. T. Hays, ¶¶ 12-13; Exh. K, Decl. C. Leman, ¶ 15; Exh. E, Decl. P. Borgic, ¶ 33; Exh. G, Decl. M. Falslev, ¶ 29.

54

332.   Proposition 12 forces farmers to utilize group housing even when their animal care, staff knowledge, and farm management practices are best suited to individual stall systems.

333.   The decrease in farm productivity driven by Proposition 12 will cause producers to lose revenue.  Small farms are more likely to cease operations than large farms, due to  a lack of adequate capital to undertake the massive investment required to meet Proposition 12's requirements.

334.   As a conservative estimate, farrowing rates will decrease on farms that comply with Proposition 12 and eliminate the use of breeding stalls by around 9%.  *See* Exh. O, Decl. S. Meyer, ¶ 20.

335.   For some farmers, the economic and productivity costs described above will be too steep to come into compliance with Proposition 12.  *See* Exh. F, Decl. N. Deppe, ¶ 20; Exh. I, Decl. T. Hays, ¶¶ 17-18; Exh. E, Decl. P. Borgic, ¶ 35.

336.   Proposition 12 will also cause producers who are unable to comply with Proposition 12 to lose business, including for sales that occur entirely outside the State of California.  Some of this lost business may be from suppliers with whom producers have contracted for many years.  *See* Exh. G, Decl. M. Falslev, ¶ 9; Exh. H, Decl. T. Floy, ¶ 33; Exh. J, Decl. P. Jordan, ¶ 9.

337.   Producers have already received letters from suppliers demanding compliance with Proposition 12.  *See* Exh. A, Decl. D. Hockman, at ¶ 12-15.

338.   Producers may be forced to satisfy Proposition 12 to continue the supply relationship with suppliers that intend to sell pork product in California, even if their sale of product to those suppliers takes place outside of California.

339.   Some suppliers will set specifications that must be met for all of their pork product across the board, regardless of what market it is sold into.  Producers thus may be forced to comply with Proposition 12 to continue a supply relationship with these suppliers, even if most of their product is not bound for California.

340.   These changes in physical plants and operations required in order to comply with Proposition 12 impose serious financial hardship on pork producers.

341.   The consequences of this would likely include further consolidation of the pork industry, as larger farms with greater capital are able to adapt and smaller farms are forced to cease operation.

### B. Proposition 12 Substantially Interferes with Interstate Commerce in Pork

342.   Producers who comply with Proposition 12 will need to spend at least an estimated $293,894,455 to $347,733,205 of additional capital in order to reconstruct their sow housing and overcome the productivity loss that Proposition 12 imposes.  *See* Exh. O, Decl. S. Meyer, ¶ 24.

343.   Plaintiffs expect that compliance with Proposition 12 will increase production costs per pig by over $13 dollars per head, a 9.2% cost increase at the farm level.  *See* Exh. O, Decl. S. Meyer, ¶ 25.

344.   Proposition 12 will impact sales of pork that take place entirely outside of California.

345.   Because of the small in-state production of sows in California compared to California's greater consumption of pork, the majority of the costs and operational changes to supply the California market will necessarily be incurred by producers operating entirely out-of-state.

346.   Selling a cut from a pig to California means the entire pig must be raised according to Proposition 12's requirements, regardless of where the other cuts are sold.  *See* Exh. A, Decl. of D. Hockman, ¶ 17; Exh. O, Decl. S. Meyer, ¶ 8.

347.   As a consequence, producers will be required to conform to Proposition 12's requirements even for pork product that is bound for other markets, even though there is no consumer demand in other states for Proposition 12 compliant pork.

348.   Further, segregating pork product throughout the supply chain is very difficult and complicated.  *See* Exh. A, Decl. D. Hockman, ¶¶ 17-18, 28.

349.   Thus, some packers and food distributors will require all of the product that they receive to comply with Proposition 12, regardless of where they sell it.  *See* Exh. N, Decl. J. Hofer, ¶¶ 18-21; Exh. A, Decl. D. Hockman, ¶¶ 16-19.

350.   This has already been the experience of NPPC members who operate sow farms on Hutterite colonies in Montana, who have been told by a packer that sends only an estimated one third of its pork to California that all hogs it buys must be Proposition 12-compliant.  Exh. N, Decl. J. Hofer, ¶¶ 18-21.

# V. THERE IS NO SOW WELFARE BENEFIT FROM MANDATING 24 SQUARE FEET PER SOW OR RESTRICTING THE USE OF BREEDING STALLS

## A. The Concept Of Sow "Welfare"

351.   Proposition 12 will not advance sow welfare.

352.   Sow welfare depends on an assessment of the individual sow and the care that is provided to that sow, not an arbitrary, prescriptive housing space number.

353.   To assess sow welfare, farmers, veterinarians, and other industry stakeholders consider a variety of objective factors.

354.   The industry uses voluntary, third party audits that consider objective physical criteria developed in collaboration with veterinarians.  These factors include body condition scoring, lameness scoring, nutrition, and water provided to the sow.

355.   Veterinarians also consider whether the needs of the sow are provided for in order to enable the sow to produce.

356.   Human management, not a prescriptive space requirement, is the most important factor determining sow welfare.

57

357.   Care from dedicated, knowledgeable farmers leads to the best welfare results for sows.  This is because the best individual to determine how to raise and house a sow is the person who is caring for it, taking into account the barn and the specific animals involved.

358.   A variety of farm management factors impact the care and attention that a sow receives, including the producers' knowledge, the feeding system used, the type of stall, the number of sows in the pen, the size of the operation, and the ease of human access in and out of stalls.

359.   Further, a sow's needs change throughout production, from the time it is weaned through inception and gestation.

360.   And a sow's welfare needs are unique to the particular sow.  One mandatory practice may harm many sows, while advancing the welfare of others.

**B. Sow Welfare And Housing**

361.   Research repeatedly demonstrates that there is no single "best" method for housing sows to provide for sow welfare.

362.   Indeed, based on their lifelong experience producing hogs, AFBF and NPPC members rely on various methods of caring for and housing their sows.  *See, e.g.*, Exh. D, Decl. G. Boerboom, ¶¶ 20, 24, 37; Exh. E, Decl. P. Borgic, ¶ 10; Exh. F, Decl. N. Deppe, ¶ 10; Exh. G, Decl. M. Falslev, ¶¶ 15, 20; Exh. H, Decl. T. Floy ¶ 23; Exh. I, Decl. T. Hays, ¶¶ 3, 20; Exh. J, Decl. P. Jordan, ¶ 11; Exh. K, Decl. C. Leman, ¶ 5; Exh. L, Decl. G. Maher, ¶¶ 6-8; Exh. C, Decl. H. Roth, ¶ 15; Exh. M, Decl. R. Spronk, ¶¶ 6-8, 21.

363.   The American Veterinary Medical Association has concluded that "[t]here are advantages and disadvantages to any sow housing system."

364.   Within a group housing system, the amount of space a sow needs depends not on a prescriptive number, but instead on the type of group housing system used, the quality of the space, and the make-up of the group in terms of size, age, parity, and type of sow.

365.   It is disastrous to farm management and sow welfare to prescribe one specific number without considering these factors.

366.   For example, gilts and younger sows are smaller than older sows, and need less space than mixed groups or groups comprised solely of older sows.

367.   As another example, group size will directly influence quality of space and the social interactions among the sows.  The larger the group, the greater the number of sub-groups that develop among dominant, intermediate, and submissive sows.  In a large group setting, the design of the feeding space becomes particularly critical to prevent submissive sows from being displaced from the feeding space and to mitigate sow aggression.

368.   Quality of space provided to sows is much more important than quantity of space per sow.

369.   Elements dictating quality of space include not only space per sow, but also design of the housing system, flooring type, group size, bedding, nutrition, the feeding mechanism, and the training of farm staff in removing sows that need individual care.

370.   Because the amount of space a sow needs depends on a variety of situation-specific factors, a prescriptive requirement will not be appropriate in all cases.

371.   Many guidelines produced by collaboration between industry stakeholders and veterinarians regarding appropriate care and housing of sows to secure sow welfare recognize that a variety of factors determine what amount of space is appropriate and do not prescribe one specific number in sow housing requirements.

372.   For example, the Common Swine Industry Audit is a third party, voluntary audit based upon standards developed by a task force of industry stakeholders, including veterinarians, producers, animal scientists, packers,

processers, and retail and food service representatives. The audit reviews 27 aspects of swine care and pre-harvest pork safety.

373.   One animal well-being topic reviewed by the audit considers space allowance per sow. Instead of tying space per pig to an arbitrary number, the Common Swine Industry Audit assesses whether a sow has the ability to easily lie down fully and stand back up within the housing. The Audit also considers body condition scores, the number of pigs with lameness or lesions, air temperature, feed and water access, and caretaker training, among other factors.

374.   The Pork Checkoff's 2018 Swine Care Handbook, drafted by academics, producers, and veterinarians, also creates recommendations for group housing space allowances. Regarding sow housing during breeding and gestation, the Handbook notes that pregnant sows can be kept "in a variety of housing situations," and that the management system should provide access to appropriate feed, water, sanitation, and air quality, facilitate the observation of individual sows to assess their well-being, and provide adequate quality and quantity of space to permit sows to "assume normal postures and express normal patterns of behavior," among other factors. It states that there are disadvantages and advantages to any sow-housing system, and that each system should be weighted based on scientific evidence, veterinary professional judgment, and caretaker management abilities. The Handbook also explains that group housing systems are less restrictive than individual stalls but "could lead to increased lameness," as well as aggression and competition for resources.

375.   With regard to space allowance recommendations in indoor group housing, the Handbook does not require one prescriptive number. Instead, it explains that space requirements are influenced by "feeding method, group size, flooring type, pen design, management practices and other factors." It states that adequate space in group housing will allow sows space for full lateral recumbency and minimize the risk of injury.

## C. There Is No Scientific Basis For The Belief That The 24-Square-Feet-Per-Sow Requirement Promotes Sow Welfare

376.   The requirement of 24 square feet per sow is an arbitrary number.

377.   It has not been scientifically shown to improve sow welfare.

378.   To compare sow welfare under different housing systems, studies look at stress hormones (cortisol), injury levels, the number of fights between sows, the ability of sows to get enough feed, the ability to maintain pregnancy, and sow longevity.

379.   In terms of square footage, at most, the science suggests that sows need room for lying down separate from room for defecating, and that less than 15 square feet per sow may compromise sow welfare in terms of longevity and risk of injury.

380.   U.S. producers typically provide at least 16 square feet per sow, with the average being 18-19 square feet per sow in group housing.

381.   There are no marginal gains to sow welfare from increasing space allowances per sow from 16-19 square feet per sow to 24 square feet per sow.

382.   Providing too large an area may decrease sow welfare.  It may lead to sows defecating in the lying area, rather than the dunging area, thus compromising hygiene.  *See* Exh. M, Decl. R. Spronk, ¶ 13.

383.   And additional floor space may permit more room for fighting, thereby increasing sow stress levels and negatively impacting sow welfare.

384.   In large floor spaces, there is often a great deal of wasted space.  Given the option, many sows choose to spend their time in a more confined pen.

385.   On the other hand, the selection of one prescriptive number is detrimental to animal welfare and farm management.

386.   The blanket 24 square feet requirement limits the ability of farm management to make housing adaptations to best address the welfare of their sows.

387. In imposing an arbitrary square foot per sow requirement, Proposition 12 requires producers to divert costs that could be spent on more direct influencers of sow welfare such as optimal nutrition, stockperson training, and advanced feeding systems to an arbitrary square feet per sow number.

388. Blindly imposing a single square foot per sow requirement on all farms denies producers the ability to manage their farms to optimally manage production while providing for sow welfare.

### D. Limiting The Use Of Breeding Stalls Harms Sow Well-Being

389. Proposition 12 prohibits the use of individual stalls except during the period from five days before farrowing and while nursing piglets, and in certain additional narrow circumstances. It therefore prohibits the industry's almost universal practice of using breeding stalls until pregnancy is confirmed, as well as the use of individual stalls to ensure the welfare of specific sows.

390. Restrictions on the use of breeding stalls decrease sow welfare during breeding and gestation.

391. Farmers who transitioned from group pens to individual stalls noticed that the sows appeared calmer and healthier in individual stalls. *See* Exh. C, Decl. H. Roth, ¶ 19; Exh. G, Decl. M. Falslev, ¶ 19; Exh. H, Decl. T. Floy, ¶¶ 20-22.

392. Sows held in individual stalls lasted on average for a greater number of parities, or farrowings, than when held in the group pen. Exh. H, Decl. T. Floy, ¶ 18.

393. Group housing exposes sows to aggression and fights, leading to a greater incidence of injuries. The sows tear at each other's vulvas and ears, leading to serious injuries that can render sows unable to continue to farrow, as well as fatalities. *See* Exh. E, Decl. P. Borgic, ¶ 12; Exh. I, Decl. T. Hays, ¶ 9; Exh. N, Decl. J. Hofer, ¶ 33. These fights occur regardless of the number of sows held in the pen. Exh. F, Decl. N. Deppe, ¶ 18.

394.   Producers that transitioned from individual stalls to group housing experienced higher cull rates and sow injuries.  *See* Exh. L, Decl. G. Maher, ¶ 9.

395.   Conversely, producers that transitioned from group housing to individual pens experienced the opposite.  *See* Exh. E, Decl. P. Borgic, ¶¶ 14-15; Exh. C, Decl. H. Roth, ¶ 16; Exh. G, Decl. M. Falslev, ¶ 20; Exh. H, Decl. T. Floy, ¶¶ 14-18.  One farmer noticed that despite tripling his herd size at the time that he transitioned from a group pen to individual stalls, the number of sows culled due to serious injuries remained constant—even with three times as many animals.  Exh. C, Decl. H. Roth, ¶ 16.  Thus, the percentage of injured sows sharply decreased on his farm.

396.   Because of these fights, sows experience greater stress in group housing than in individual stalls.

397.   The consequences of stress and fights are particularly severe to sow welfare prior to the confirmation of pregnancy and in the early stages of gestation.

398.   Mixing sows into a group setting after weaning results in higher levels of stress than mixing sows into a group setting after pregnancy is confirmed.  *See, e.g.*, Exh. M, Decl. R. Spronk, ¶ 11.

399.   By preventing the use of breeding stalls during the 30 to 40 day period between weaning and confirmation of pregnancy, Proposition 12 puts sows at greater risk of injury and stress during the vulnerable stages of breeding and gestation.

400.   The stress and fights in the group pen increase the chance that a sow's embryo will fail to attach following implantation, or that a sow will lose a pregnancy or drop a litter size.  Exh. E, Decl. P. Borgic, ¶ 22-23; Exh. F, Decl. N. Deppe, ¶¶ 18-19; Exh. H, Decl. T. Floy, ¶ 16; Exh. K, Decl. C. Leman, ¶ 16.

401.   As one farmer explained, Proposition 12's restriction on the use of breeding stalls after weaning until the confirmation of pregnancy would effectively "kill piglets."  Exh. C, Decl. H. Roth, ¶ 22; *see also* Exh. M, Decl. R. Spronk, ¶ 11.

63

402.   Proposition 12 will also cause sows still in heat to be moved back into a group pen.  This is dangerous to the individual sow, the herd, and workers, because the sow in heat may attempt to mount or ride other sows and farm hands and cause injury.  Exh. E, Decl. P. Borgic, ¶¶ 19-21.

403.   Proposition 12 also prohibits many producers' practice of relying on breeding stalls to allow sows to recover peacefully from their pregnancies and gain back needed weight when in a weakened and vulnerable state after weaning.  Exh. E, Decl. P. Borgic, ¶ 19; Exh., F, Decl. N. Deppe, ¶¶ 16-17; Exh. K, Decl. C. Leman, ¶ 16.

404.   It is much harder to provide a sow with individualized nutrition appropriate to its body condition and stage of pregnancy in a group setting.

405.   Appropriate nutrition is especially critical for sows coming out of farrowing and prior to a new pregnancy.  Sows may have lost weight during lactation or gained excessive weight, and require tailored nutrition to recover.  *See* Exh. E, Decl. P. Borgic, ¶ 19; Exh. F, Decl. N. Deppe, ¶¶ 16-17.

406.   Thus, it is a cruel practice to move a sow back into a group setting directly after weaning when it is weak and vulnerable.

407.   In addition to providing benefits during breeding and gestation, individual stalls advance the welfare of sows that do poorly in group housing.

408.   Group housing is particularly detrimental to the welfare of submissive sows, which are bullied by more aggressive sows and can be cut off from food sources.  Exh. I, Decl. T. Hays, ¶¶ 9-10; Exh. H, Decl. T. Floy, ¶ 14.

409.   A pig that is not growing will receive better care in an individual stall than in a group setting, as the stall permits more individualized attention and care. Exh. M, Decl. R. Spronk, ¶¶ 11-12; Exh. H, Decl. T. Floy, ¶ 19.

410.   It is more difficult for producers to identify ill or injured sows in a group setting and remove them to stalls for individualized care. Exh. I, Decl. T. Hays, ¶ 12.

### E. Policing Compliance With Proposition 12 Threatens Sow Welfare

411.   CDFA explains that it may regulate compliance with Proposition 12 through verification audits.  Verification audits or inspections would require auditors to visit the sow farms to inspect producers' practices.

412.   Direct inspections threaten the health and welfare of sows due to biosecurity concerns.

413.   Contagious diseases can quickly decimate herds and present a serious problem for the welfare of sows housed on breeding farms.

414.   Farms take careful measures to prevent the potential of any pathogen entry, including filtering air that enters the barn.

415.   Breeding farms are intentionally constructed in remote areas to prevent the spread of diseases.

416.   A critical biosecurity measure on farms is to limit access to the farm by unnecessary persons, which is considered a hazard to herd health.

417.   Persons who have recently visited other hog farms of unknown health status present a serious threat to biosecurity and herd health.  Inspectors who visit multiple farms of unknown health status may compromise the biosecurity of breeding farms by spreading contagious diseases among breeding farms.

418.   In this manner, CDFA's likely method of verifying compliance with Proposition 12 poses a direct threat to the welfare of sows.

## VI. AT LEAST AS APPLIED TO PORK, PROPOSITION 12 OFFERS NO HUMAN HEALTH OR SAFETY BENEFIT

### A. Proposition 12 Has No Relation to Foodborne Illness or Human Health

419.   Contrary to the proponents' claims, there are no human health benefits to Proposition 12 as applied to pork.

420.   Proposition 12 is unnecessary because under the Federal Meat Inspection Act, the U.S. Department of Agriculture's Food Safety and Inspection

Service (FSIS) inspects meat product shipped into California to ensure that the product is safe.  Indeed, 488 FSIS employees operate specifically in California to protect food safety.

421.   FSIS ensures product safety by issuing regulations that require establishments to adopt Hazard Analysis and Critical Control Point Plans governing safe slaughter and production practices.  FSIS also tests samples of products at facilities to ensure that the products are safe and wholesome.

422.   Proposition 12 will not provide any additional protection against the threat of foodborne illness in pork products, because it has no relation to food safety.

423.   First, Proposition 12 addresses only *sow* housing practices at breeding farms.  But sows do not generally enter the food chain, and when they do it is as cooked or processed pork that is not covered by Proposition 12.

424.   The pork products that enter the market and present some risk of causing foodborne illness derive almost entirely from the *offspring* of sows, not from the sows themselves.  Proposition 12 does nothing to address the safety of these products.

425.   The idea that the square footage provided to sows has bearing on the safety of the food product derived from their offspring is incredible.

426.   A foodborne risk to human health from uncooked pork would generally result from pathogen transmission.  Salmonella is the most common pathogen in pork products that might cause human illness, as well as the most researched.  Around 90 percent of the scientific literature is focused on salmonella.

427.   Pigs rarely become ill from most types of salmonella.

428.   If a sow contracted salmonella, the salmonella would only potentially transmit to its offspring if the sow was shedding pathogens in the farrowing stall when she gave birth.

429.   Even if a sow passed salmonella on to her piglets, this transmission would not pose a threat to human health.  There is almost no likelihood of the offspring carrying the salmonella to market.

430.   Piglets are separated from the sow after three weeks of nursing in the farrowing stalls.  And during much of nursing, piglets have maternal antibody protection that would stem disease transmission.

431.   After weaning, piglets are transferred to nurseries or wean-to-finish barns and are physically separated from the sows.

432.   This separation is done deliberately to prevent diseases from being transmitted from the sow to the offspring while the piglets develop.

433.   There is a six month lapse between the birth of offspring and the slaughter of market hogs.  Any salmonella the offspring received from the sow would have run its course by the time the sows reached market.  Any infection held early in life is not likely to be present even several months later.

434.   Thus, even if a sow transmitted salmonella to her offspring, the transmission would not pose a realistic threat to human health.

435.   Second, even putting aside that Proposition 12 does not address the housing of market hogs, the animals that actually enter the market, the scientific evidence does not support a causal link between swine housing and food safety characteristics of pigs.

436.   Interventions taken on farms to prevent the spread of salmonella into food products are only minimally effective, because salmonella that may infect the food supply is more commonly contracted at plants than on farms.

437.   Strains of salmonella found in food products at grocery stores are more commonly traced to strains of salmonella found at slaughter and processing plants than at farms.

438.   Further, there is no connection between requiring 24 square feet per sow and sow health, let alone the health of piglets or humans.

439.   The majority of research analyzing any link between space provided to pigs and their health analyzes the health of growing animals such as market hogs and finishing pigs, not breeding animals such as sows.

440.   Although some of these studies suggest that lower stocking density correlates with lower salmonella rates among growing pigs, those studies do not apply to sows.  Growing pigs are generally held in much different space allocations than sows.

441.   Even assuming that research related to housing conditions for market hogs and finishing pigs applies to sows, no studies establish that a move from 16 to 24 square feet per sow in open housing impacts health, let alone in any way that would transfer to food products

442.   There is no link between Proposition 12's sow housing requirements and food safety or foodborne illness.

**B. If Anything, Proposition 12 Will Increase Pathogen Transmission**

443.   Studies show that sows housed in groups rather than in individual stalls have a higher incidence of salmonella.  This worse health outcome is likely due to the fact that sows in group housing, unlike animals confined in stalls, have the opportunity to eat manure, which spreads pathogens and disease.  Thus, restricting the amount of time that a sow can spend in an individual breeding stall may increase the risk of pathogen transmission among the sows.

444.   Proposition 12 will likely lead to more pigs being housed outdoors in pastures, rather than in indoor open housing that must comply with Proposition 12.

445.   Studies demonstrate that pigs housed outside, where they have the opportunity to wallow in mud, exhibit greater incidence of pathogens than those housed indoors.  Thus, the greatest risk of pathogen transmission is from pasture-raised sows.

446.   If Proposition 12 does result in pigs being moved outside, we can expect an increase in other kinds of pathogens that create a greater risk to human health than salmonella, including one called Trichinella, and another called Toxoplasma.

447.   Trichinella can lead to trichinosis in humans, a disease caused by infection from the Trichinella roundworm.  Trichinella results in diarrhea, abdominal cramps, nausea, and vomiting in humans.

448.   When the industry moved pigs inside to barn housing, issues with this pathogen were largely eliminated.  Indeed, the Centers for Disease Control and Prevention reports that between 2008 and 2012, there were only 10 cases nationwide from commercial pork.  Other cases of trichinosis resulted from wild game or home-raised pork.

449.   Re-introduction of outdoor housing could revive incidences of Trichinella.

450.   It could also increase incidences of Toxoplasma. The infective oocysts of Toxoplasma are shed in the feces of infected cats and are transmitted to mammals through ingestion of cat feces.

451.   Interaction with cats and their feces is more likely for pigs that are held outdoors.

452.   Many studies widely consider Toxoplasma in the top five causes of death due to foodborne illness

453.   There is no possibility that Proposition 12 will improve human food safety.

## **FIRST CLAIM FOR RELIEF**

### **(Impermissible Extraterritorial Regulation)**

454.   Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

455.   The Commerce Clause affirmatively grants Congress the power to "regulate Commerce … among the several States."  U.S. Const. art. I, § 8.

456.   The dormant Commerce Clause in consequence restricts states from engaging in extraterritorial regulation.

457.   A state law that has the practical effect of regulating commerce occurring outside the state is invalid under the Commerce Clause.

458.   Proposition 12 violates the Commerce Clause and principles of interstate federalism by regulating pork producers and the pork market outside the State of California.

459.   Proposition 12 extends California's police powers beyond its borders by regulating conduct that occurs outside the state.

460.   Defendants are purporting to act within the scope of their authority under state law in implementing Proposition 12.

461.   Defendants are liable to Plaintiffs for proper redress under 42 U.S.C. § 1983 because Proposition 12 deprives Plaintiffs' members of the rights, privileges, and immunities secured by the Commerce Clause of the U.S. Constitution and principles of interstate federalism embodied in its structure.

462.   Absent declaratory and injunctive relief, Plaintiffs will suffer irreparable harm.

## SECOND CLAIM FOR RELIEF
**(Excessive Burden on Interstate Commerce in Relation to Putative Local Benefits)**

463.   Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

464.   The Commerce Clause restricts states from placing burdens on interstate commerce that are clearly excessive when compared with putative local benefits.

465.   Proposition 12 places excessive burdens on interstate commerce without advancing any legitimate local interest.

466.   Proposition 12 is not justified by any animal-welfare interest.

467.   Proposition 12 has no connection to human health or foodborne illness.

468.   Defendants are purporting to act within the scope of their authority under state law in implementing Proposition 12.

469.   Defendants are liable to Plaintiffs for proper redress under 42 U.S.C. § 1983 because Proposition 12 deprives Plaintiffs' members of the rights, privileges, and immunities secured by the Commerce Clause of the U.S. Constitution.

470.   Absent declaratory and injunctive relief, Plaintiffs will suffer irreparable harm.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following relief:

A. A declaratory judgment, pursuant to 28 U.S.C. § 2201, that Proposition 12 is invalid because it violates the U.S. Constitution and is unenforceable;

B. A permanent injunction enjoining the Defendants from implementing or enforcing Proposition 12;

C. An order awarding Plaintiffs their costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

D. Such other and further relief as the Court deems just and proper.

Dated: December 5, 2019          MAYER BROWN LLP
                                 Timothy S. Bishop
                                 C. Mitchell Hendy


                                 By:   *s/ C. Mitchell Hendy*

                                 C. Mitchell Hendy
                                 E-mail:  *mhendy@mayerbrown.com*
                                 Attorneys for Plaintiffs

71