UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL PORK PRODUCERS COUNCIL & AMERICAN FARM BUREAU FEDERATION,<br><br>Plaintiffs,<br><br>v.<br><br>KAREN ROSS, in her official capacity as Secretary of the California Department of Food and Agriculture, SONIA ANGELL, in her official capacity as Director of the California Department of Public Health, and XAVIER BACERRA, in his official capacity as Attorney General of California,<br><br>Defendants,<br><br>THE HUMAN SOCIETY OF THE UNITED STATES; ANIMAL LEGAL DEFENSE FUND; ANIMAL EQUALITY; THE HUMAN LEAGUE; FARM SANCTUARY; COMPASSION IN WORLD FARMING USD; and COMPASSION OVER KILLING<br><br>Defendant-Intervenors. | Case No.:  19-cv-02324 W (AHG)<br><br>**ORDER:**<br>**(1) GRANTING DEFENDANTS' MOTION TO DISMISS [DOC. 18]; AND**<br><br>**(2) GRANTING DEFENDANT-INTERVENORS' MOTION FOR JUDGMENT ON THE PLEADINGS [DOC. 19.]** |

Pending before this Court are Defendants' motion to dismiss and Defendant-Intervenors' motion for judgment on the pleadings. The Court decides the matters without oral argument pursuant to Civil Local Rule 7.1(d)(1). For the reasons that follow, the Court **GRANTS** Defendants' motion to dismiss [Doc. 18] and Defendant-Intervenors' motion for judgment on the pleadings [Doc. 19] with leave to amend.

## I. BACKGROUND

National Pork Producers Council & American Farm Bureau Federation (collectively "Plaintiffs") file this case against Defendants Karen Ross, in her official capacity as Secretary of California Department of Food and Agriculture, Sonia Angell, in her official capacity as Director of the California Department of Public Health, and Xavier Bacerra, in his official capacity as Attorney General of California (collectively "Defendants"). Plaintiffs file this action for declaratory and injunctive relief and allege California's Proposition 12 violates the Commerce Clause of the U.S. Constitution.

### A. Procedural Background

This case was initially filed on December 5, 2019. (*Compl.* [Doc. 1].) On January 9, 2020 Defendant-Intervenors' motion to intervene was granted. [Doc. 17.] On January 10, 2020, Defendants filed a motion to dismiss for failure to state a claim. [Doc. 18.] That same day Defendant-Intervenors filed a motion for judgment on the pleadings. [Doc. 19.] Plaintiffs filed an opposition to these motions on February 28, 2020. [Doc. 26.]

On January 29, 2020, California Egg Farmers filed a supplemental Amicus Brief in support of the Defendants' motion to dismiss and Defendant-Intervenors' motion for judgment on the pleadings. [Doc. 25.] A supplemental Amicus Brief in support of the Plaintiffs was filed on March 10, 2020, by the States of Alabama, Arkansas, Indiana, Iowa, Kansas, Louisiana, Missouri, Nebraska, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, and West Virginia. [Doc. 32.]

### B. Factual Background

Plaintiffs allege Proposition 12 violates the Commerce Clause of the U.S. Constitution because it reaches extraterritorially and imposes substantial burdens on interstate commerce. (*Compl.* ¶ 31.) Plaintiffs seek a declaration that Proposition 12 violates the Commerce Clause and seek an injunction against the enforcement of Proposition 12's requirements concerning pork. (*Id.* ¶¶ 31, 32.)

Proposition 12 is a ballot initiative passed in November 2018 that amended the California Health and Safety Code. (*Id.* ¶ 14.) Proposition 12 regulates the production of veal, pork, and eggs. (*Id.* ¶ 33.) Importantly for this case, it forbids the sale in California of pork meat from the hogs born of sows (female pigs) not housed in conformity with the law's requirements. (*Id.* ¶ 21.) The law "requires that a sow cannot be confined in such a way that it cannot lie down, stand up, fully extend its limbs, or turn around without touching the side of its stall or another animal." (*Id.* ¶ 23.) This requirement, known as the stand up-turn around requirement, "requires producers to house their sows together in a group, referred to as 'group housing.'" (*Id.* ¶¶ 23, 24.) In contrast, individual stalls each hold one sow and do not allow sows to turn around. (*Id.* ¶ 24.) Thus, Proposition 12 bans the use of individual stalls that do not meet the stand up-turn around space requirements. (*Id.* ¶25.)

The U.S. Department of Agriculture's Census of Agriculture for 2017 estimates nearly 65,000 farms nationwide sold hogs for a market value of $26 billion. (*Id.* ¶ 3.) Pigs are raised throughout the country with a majority of production concentrated in the Midwest and North Carolina. (*Id.* ¶ 5.) A small percentage of farms are structured as "wean to finish," meaning the pigs are held at the same farm throughout the production process. (*Id.* ¶ 145.) However, a majority of the production of pork comes from a segmented production chain. (*Id.* ¶ 138.) Sows give birth to piglets on sow-specific farms where the piglets are raised for about three weeks before they are weaned at approximately 10 pounds. (*Id.* ¶ 8.) After weaning, piglets are generally moved to nursery farms for about six to eight weeks. (*Id.* ¶¶ 142, 143.) At six to eight weeks

piglets have grown into "feeder pigs" and are "transferred again to separate finishing facilities." (*Id*. ¶ 143.) Pigs spend 16 to 17 weeks at the finishing farms before being sent to markets and packers where the pigs are slaughtered. (*Id*. ¶ 144.) Packers slaughter and butcher the market hogs and sell the pork to wholesalers or retailers, which then distribute to consumers. (*Id*. ¶ 124.) Pork product from one hog is cut into primals, or different cuts of meat, and then shipped to different end users across the country. (*Id*. ¶ 96.)

Beginning December 31, 2021, Proposition 12 requires each sow whose offspring is intended to be sold into California be allotted at least 24 square feet in the group pen. (*Id*. ¶ 26.) However, Proposition 12 has an immediate impact on what producers must do now given the time needed for building and production changes. (*Id*.) Plaintiffs allege these requirements are "inconsistent with industry practice and standards, generations of producer experience, scientific research, and standards set by other states." (*Id*. ¶ 28.) Plaintiffs also allege these requirements impose costly mandates on producers that interfere with commerce among the states and impose costs on pork producers that will ultimately increase costs for American consumers. (*Id*.)

In California, there are an estimated 8,000 breeding sows and "1,500 out of California's 8,000 sows are used in commercial breeding" which produces around 30,000 offspring a year. (*Id*. ¶¶ 16, 17.) However, "California's pork consumption makes up about 13 percent of the national market." (*Id*. ¶ 20.) As a result, California's in-state sow breeding does not supply the demand of pork consumption in the state. (*Id*.) Thus, the offspring of approximately "673,000 sows is required to satisfy California consumers' demand for pork meat annually." (*Id*.)

Plaintiffs claim that by imposing these requirements on an industry that is national in scope, Proposition 12 unconstitutionally interferes with the functioning of a $26 billion a year interstate industry. (*Id*. ¶ 303.) In addition, Plaintiffs claim that compliance with Proposition 12 will require new and less efficient methods of animal husbandry that will increase operating, staff training and veterinary costs. (*Id*. ¶ 322.) As a result, Plaintiffs

allege producers may be forced to comply with Proposition 12 standards even if most of their product is not bound for California. (*Id.* ¶¶ 339, 347.)

## II. LEGAL STANDARD

The Court must dismiss a cause of action for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. See Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995). A complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or for insufficient facts under a cognizable theory. Balisteri v. Pacifica Police Dep't., 901 F.2d 696, 699 (9th Cir. 1990). In ruling on the motion, a court must "accept all material allegations of fact as true and construe the complaint in a light most favorable to the non-moving party." Vasquez v. L.A. Cnty., 487 F.3d 1246, 1249 (9th Cir. 2007).

A complaint must contain "a short plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has interpreted this rule to mean that "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 554, 555 (2007). The allegations in the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).

Leave to amend should be freely granted when justice so requires. See Fed. R. Civ. P. 15(a). However, where an amendment would be futile, a district court may dismiss a pleading without leave. Chubb Custom Ins. Co. v. Space Sys./Loral, Inc., 710 F.3d 946, 956 (9th Cir. 2013).

A motion for judgment on the pleadings may be brought "[a]fter the pleadings are closed—but early enough not to delay trial[.]" Fed. R. Civ. P. 12(c). "Analysis under Rule 12(c) is substantially identical to analysis under Rule 12(b)(6) because, under both rules, a court must determine whether the facts alleged in the complaint, taken as true,

entitle plaintiff to a legal remedy." Chavez v. United States, 683 F.3d 1102, 1108 (9th Cir. 2012).

### III. DISCUSSION

Plaintiffs allege Proposition 12 violates the dormant Commerce Clause. The Commerce Clause authorizes Congress to "regulate commerce with foreign Nations, and among the several States…." U.S. Const., art. I, § 8, cl. 3. "The Commerce Clause has accordingly been interpreted by this Court not only as an authorization for congressional action, but also, even in the absence of a conflicting federal statute, as a restriction on permissible state regulation." Hughes v. Oklahoma, 441 U.S. 322, 326 (1979). "This limitation on state power has come to be known as the dormant Commerce Clause." Nat'l Ass'n of Optometrists & Opticians v. Harris, 682 F.3d 1144, 1147 (9th Cir. 2012).

The Supreme Court has adopted a two tiered approach in determining whether a law violates the dormant Commerce Clause. Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth., 476 U.S. 573, 578–79 (1986). First, a law that (1) "discriminate[s] against interstate commerce" or (2) "directly regulate[es] extra-territorial conduct" is "generally struck down without further inquiry." Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris, 729 F.3d 937, 948–49 (9th Cir. 2013) (quoting Brown, 476 U.S. at 579). Second, a law that (3) "regulate[s] even-handedly to effectuate a legitimate local public interest, and [where] its effects on interstate commerce are only incidental, [] will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefit." Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970). Thus, "[i]f a legitimate local purpose is found, the question becomes one of degree." Id. "[T]he extent of the burden that will be tolerated will of course depend on the nature of the local interest involved and whether it could be promoted as well with a lesser impact on interstate activities." Id.

//

### A. Extraterritorial Effect

Plaintiffs argue Proposition 12 violates the extraterritorial principle because it regulates wholly out-of-state conduct. (*Compl.* 47:7–8.) Any "statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." Healy v. Beer Institute, Inc., 491 U.S. 324, 336 (1989). However, "[a] statute is not invalid merely because it affects in some way the flow of commerce between the states." Eleveurs, 729 F.3d at 948–49. Even when a statute "has significant extraterritorial effects it passes Commerce Clause muster when those effects result from the regulation of in-state conduct." Chinatown Neighborhood Ass'n v. Harris, 794 F.3d 1136, 1145 (9th Cir. 2015). "The critical inquiry is whether the practical effect of the regulation is to control the conduct beyond the boundaries of the State." Healy, 491 U.S. at 336 (quoting Brown, 476 U.S. at 579).

A statute that applies both to California entities and out-of-state entities does not target wholly extraterritorial activity. See Eleveurs, 729 F.3d at 949. In Eleveurs, the statute at issue "applie[d] both to California entities and out-of-state entities and preclude[d] the sale within California of products produced by force feeding birds." Id. Because the statute precluded sales within California of products produced by force feeding birds regardless of where the force feeding occurred, the statute did not directly target out-of-state entities. See id. The court in Eleveurs reasoned that the economic impact did not "depend on *where* the items were produced, but rather *how* they were produced." Id. at 948. In other words, the statute was not directed solely at out-of-state producers because it applied to both in-state and out-of-state producers. See id. at 949.

Similarly here, Proposition 12 applies both to California entities and out-of-state entities. (*Compl.* ¶ 292.) Proposition 12 precludes the sale within California of products produced by hogs not raised in conformity with the requirements of Proposition 12, regardless of where the hogs are raised. It therefore does not regulate wholly out-of-state

1  conduct. "[I]n-state and out-of-state" hog farmers "are burdened in exactly the same
2  way–all are effectively prevented from" raising hogs in violation of Proposition 12 if they
3  wish to sell their products to California. See Hass v. Oregon State Bar, 883 F.2d 1453,
4  1462 (9th Cir. 1989); see also Rocky Mountain Farmers Union v. Corey, 913 F.3d 940,
5  952 (9th Cir. 2019) (explaining that "subjecting both in and out-of-jurisdiction entities to
6  the same regulatory scheme to make sure that out-of-state jurisdiction entities are subject
7  to consistent [] standards is a traditional use of the State's police power").

8       Plaintiffs argue Proposition 12 reaches extraterritorially because it will "impose
9  California's . . . housing requirements on other states and their producers" and "farms
10 developing some or all of their product primarily for sale outside California will likely be
11 required to meet Proposition 12" regulations. (*See Compl.* ¶¶ 31, 301.)  However, such
12 arguments of disproportionate impact are ineffective in an extraterritorial effect analysis.
13 Even when a statute "has significant extraterritorial effects it passes Commerce Clause
14 muster when . . . those effects result from the regulation of in-state conduct." Chinatown,
15 794 F.3d at 1145.  Further, California may seek to influence which hog products are sold
16 in-state and create incentives for less harmful farming practices.  See Rocky Mountain
17 Farmers Union, 913 F.3d at 952.  Although Proposition 12's regulations may
18 consequentially touch out of state farmers, "[t]he Commerce Clause . . . does not treat
19 regulations that have upstream effects on how sellers who sell to California buyers
20 produce their goods as being necessarily extraterritorial." Id. (citing Minnesota v. Clover
21 Leaf Creamery Co., 449 U.S. 456, 472 (1981)).

22      Generally, a statute violates the extraterritorial principle when it is "directed at
23 interstate commerce and only interstate commerce." See National Collegiate Athletic
24 Ass'n v. Miller, 10 F.3d 633, 638 (9th Cir. 1993).  In NCAA, the statute only regulated
25 the NCAA—an inherently interstate organization. Id.  In order to avoid liability under
26 the statute, the NCAA needed to apply Nevada's procedures throughout the entire
27 country. Id. at 639.  This type of extraterritorial effect is forbidden by the commerce
28

clause because it "could control the regulation of the integrity of a product in interstate commerce that occurs wholly outside Nevada's borders." Id.

In contrast, Proposition 12 is not directed at interstate commerce and only interstate commerce. See id. at 638. Unlike the Nevada statute, Proposition 12 does not call for uniform procedures and practices throughout the entire country. Only those out-of-state producers who sell directly to California need to follow the regulations that Proposition 12 details. In addition, although a majority of production might take place outside of California, California contains "approximately 8,000 sows" of which "1,500 of those are in commercial production." (*Compl.* ¶ 292.) Proposition 12 applies to these California producers just the same as out-of-state producers.

Thus, Proposition 12 does not regulate extraterritorially because it does not target solely interstate commerce and it regulates in-state and out-of-state conduct equally. Although there are upstream effects on out-of-state producers, those effects are a result of regulating in-state conduct. The motions challenging the sufficiency of Plaintiffs' allegations supporting the unconstitutional regulation claim are accordingly **GRANTED** and Plaintiffs' first claim for relief is denied without prejudice. If Plaintiffs elect to file an amended extraterritorial claim they will need to allege facts that demonstrate Proposition 12 regulates conduct wholly outside of California.

### B. Substantial Burden on Interstate Commerce

In their second claim for relief, Plaintiffs allege that Proposition 12 places excessive burdens on interstate commerce. (*Compl.* ¶ 465.) The second tier of the dormant Commerce Clause analysis focuses on statutes that "regulate[] even-handedly to effectuate a legitimate local public interest." Pike, 397 U.S. at 142. These laws "will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefit." Id. "[U]nder Pike, a plaintiff must first show that the statute imposes a substantial burden before the court will 'determine whether the benefits of the

1  challenged laws are illusory.'" Eleveurs, 729 F.3d at 951–52 (quoting Optometrists, 682
2  F.3d at 1155).

3  "[M]ost statutes that impose a substantial burden on interstate commerce do so
4  because they are discriminatory" or attempt to regulate extraterritorially. See Eleveurs,
5  729 F.3d at 952. Plaintiffs do not raise a discriminatory argument, and as we concluded
6  above, their extraterritorial argument fails. However, the Ninth Circuit has found a small
7  number of cases violate the dormant Commerce Clause because they "generally result
8  from inconsistent regulation of activities that are inherently national or require a uniform
9  system of regulation." Optometrists, 682 F.3d at 1148; Chinatown, 794 F.3d at 1146;
10 Eleveurs, 729 F.3d at 952.

11  "Where [a] regulation does not regulate activities that inherently require a uniform
12 system of regulation and does not otherwise impair the free flow of materials and
13 products across state borders, there is not a significant burden on interstate commerce."
14 Optometrists, 682 F.3d at 1154–55. In Optometrists, the plaintiffs challenged a
15 California law that "prohibited opticians and optical companies from offering
16 prescription eyewear at the same location in which eye examinations are provided." Id.
17 at 1146. The plaintiffs wanted opticians to be able to offer similar one-stop shops as
18 optometrists and ophthalmologists could offer. Id. at 1151. They argued the law
19 imposed a significant burden because the restriction of one-stop shops resulted in a
20 transfer of market share income from out-of-state to in-state eyewear sellers. Id. at 1150.
21 However, the court found the plaintiffs failed to raise an argument regarding a burden on
22 interstate commerce because the plaintiffs did not produce evidence that the law
23 interfered with the flow of eyewear into California and the court concluded the activities
24 did not require a uniform system of regulation. Id. at 1155; see also NCAA, 10 F.3d at
25 639 (finding a Nevada statute unconstitutional because its extraterritorial reach created a
26 uniform system of application of enforcement proceedings.)
27  Plaintiffs make two arguments in support of their claim that Proposition 12
28 imposes a substantial burden on interstate commerce. First, Plaintiffs claim Proposition

12 substantially interferes with the interstate commerce of pork.  (*Compl.* 56:6–7.) Plaintiffs allege that if a cut of pork is sold in California, the entire pig must be raised in accordance with Proposition 12 requirements.  (*Id.* ¶ 346.)  This means producers will be required to conform to Proposition 12's standards even for cuts of pork bound for other states where there is no consumer demand for Proposition 12 pork.  (*Id.* ¶ 347.) However, while Proposition 12 might result in barriers to the production of pork, there are no barriers to the flow of pork across state lines.  See Optometrists, 682 F.3d at 1155. Further, unlike the statute in NCAA, the fact that some Proposition 12 compliant pork might reach states other than California does not mean Proposition 12 has the effect of requiring a uniform system of regulation.  While Proposition 12 will require "many producers" to remodel their farms, (*Compl.* ¶ 231), Plaintiffs have not alleged that Proposition 12 will require a uniform system of regulation.

  Plaintiffs' second argument in support of their claim that Proposition 12 imposes a substantial burden on interstate commerce is that compliance with Proposition 12 will result in substantial costs on out-of-state producers.  (*Compl.* 51:3.)  They allege producers will incur direct costs from required renovations and indirect costs from new and less efficient methods of animal husbandry.  (*Id*. ¶¶ 310, 322.)  "Supreme Court precedent establishes that there is not a significant burden on interstate commerce merely because a non-discriminatory regulation precludes a preferred, more profitable method of operating."  Optometrists, 682 F.3d at 1154; see also Exxon Corp. v. Governor of Maryland, 437 U.S. 117 (1978).  This is because the Commerce Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations."  Exxon, 473 U.S. at 127–28.  Although Proposition 12's regulations may burden pork producers and result in a less efficient mode of operation, there is no burden on interstate commerce merely because it is less profitable than a preferred method of operation.

  In support of their argument that Proposition 12 will impose substantial costs on producers, Plaintiffs claim the pork industry will consolidate into larger farms and

smaller farms will cease operations as a consequence of increased costs. (*Compl.* ¶ 341.) However, "interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one [] supplier to another." Exxon, 437 U.S. at 127. While pork producers and consumers might be injured economically, "that argument relates to the wisdom of the statute, not its burden on commerce." See id. at 128. The fact that changes to the physical farms and operations might impose financial burdens on the hog producers is not enough to establish a substantial burden on interstate commerce.

Thus, Plaintiffs have failed to demonstrate that there is a substantial burden on interstate commerce. As such, the Court need not determine whether the benefits of the challenged law are illusory. The motions challenging the sufficiency of Plaintiffs' substantial burden on interstate commerce claim for relief are **GRANTED** and the second claim for relief is dismissed with leave to amend.

### IV. Conclusion & Order

For the foregoing reasons, the court **GRANTS** Defendants' motion to dismiss [Doc. 18] and Defendant-Intervenors' motion for judgment on the pleadings [Doc. 19] with leave to amend.

Plaintiffs shall have 14 days to file an amended pleading, if any, to cure the defects detailed above.

**IT IS SO ORDERED.**

Dated: April 27, 2020

Hon. Thomas J. Whelan
United States District Judge